# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

### 08-979

STATE OF LOUISIANA

VERSUS

HENRY LEO EAGLIN, JR.

**********

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. 112586
HONORABLE EDWARD D. RUBIN, DISTRICT JUDGE

**********

**ULYSSES GENE THIBODEAUX**
**CHIEF JUDGE**

**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Jimmie C. Peters, and Michael G. Sullivan, Judges.

**AFFIRMED.**

Michael Harson
District Attorney, 15th Judicial District Court
Keith A. Stutes
Assistant District Attorney, 15th Judicial District Court
P. O. Box 3306
Lafayette, LA 70502-3306
Telephone: (337) 232-5170
COUNSEL FOR:
        Plaintiff/Appellee - State of Louisiana

Edward Kelly Bauman
Louisiana Appellate Project
P. O. Box 1641
Lake Charles, LA 70602-1641
Telephone: (337) 491-0570
COUNSEL FOR:
        Defendant/Appellant - Henry Leo Eaglin, Jr.

**THIBODEAUX, Chief Judge.**

A jury convicted the Defendant, Henry Leo Eaglin, Jr., of second degree murder. He was sentenced to life imprisonment at hard labor, without benefit of parole, probation, or suspension of sentence. The Defendant appeals, asserting that the evidence at trial was not sufficient to support a conviction and that the trial court erred in denying his motion to suppress.

For the following reasons, we affirm.

## ISSUES

We shall consider whether: (1) the evidence was insufficient to sustain the Defendant's conviction for second degree murder; and, (2) the trial court erred in denying the Defendant's motion to suppress an inculpatory statement.

## FACTS

A jury convicted the Defendant, Henry Leo Eaglin, Jr., of the second degree murder of his uncle, Phillip Eaglin. The victim was found unresponsive in his home on Monday morning, July 17, 2006. Autopsy results revealed a cause of death of asphyxia due to manual strangulation. Forensic pathologist, Dr. Collie Michael Trant, performed the autopsy and concluded that death occurred between 5:00 p.m. on Sunday, July 16, 2006, and 3:00 to 4:00 a.m. on Monday, July 17, 2006.

The autopsy revealed several scratches and scrapes on the victim's neck, beneath his chin. Severe, internal damage to the victim's neck tissues was found to have occurred as well, due to the exertion of an excessive amount of force on the neck. The victim's larynx was fractured into two pieces, leaving a right half and a left half. Dr. Trant opined that the fracturing of the larynx would not have killed the victim, but rather the victim's death was caused by the manual strangulation that occurred simultaneously with the occurrence of the fracture.

No physical evidence was presented at trial to link the Defendant to the crime. More specifically, the victim's DNA was not found on the Defendant's clothing, and none of the Defendant's DNA was found under the victim's fingernails. However, circumstantial evidence of the Defendant's guilt was presented by the State.

An altercation occurred between the victim and the Defendant, who lived with the victim, on or about Sunday morning, July 16, 2006, near 1:00 a.m. The Defendant alleged that as he sat on the couch eating, the victim struck him in the head with a hammer. The Defendant pursued the victim out of the house, breaking the glass screen door in the process, but he was unable to catch the victim.

The victim called his daughter, Leona Eaglin, between 1:00 a.m. and 1:30 a.m., told her about the altercation, and stated that he struck the Defendant in the head with a hammer. Leona Eaglin was concerned and, in turn, called her sister, Deirdre Moss, who lived closer to their father to advise her of the situation. Leona then called her father's house. The Defendant answered the phone, stating that the victim was not there. According to Leona, the Defendant was very angry and was repeatedly threatening to harm or "kill" the victim.

The Defendant left the victim's home shortly thereafter. He and the victim spent the rest of the morning at different locations. The victim returned to his home shortly after 7:00 that morning. At about the same time, the Defendant stopped by Theresa Eaglin's home. Mrs. Eaglin is the victim's ex-wife and the Defendant's aunt. He angrily recounted the argument and having been hit with the hammer by the victim, again repeating his threats to do harm to and even kill the victim.

The Defendant left there and proceeded to the victim's home to get some of his clothes. He arrived at about the same time as the victim's daughter, Deirdre. Tensions were still high between the Defendant and the victim, and Deirdre had to

2

intervene to stop another physical altercation from occurring. The victim allowed the Defendant to enter the house to get some of his clothes. The Defendant was then taken by Deirdre to his mother's house. During the drive, the Defendant repeatedly stated that he was going to kill the victim. Deirdre gave the Defendant her cell phone number and had the Defendant agree to call her before he attempted to go back to the victim's home to retrieve any of his things. She advised him to stay away and allow her to get whatever he needed from the house.

Deirdre stated that she saw the victim alive for the last time at approximately 4:30 that afternoon at his home when she went by to check on him. The victim's son, Henry Leo Eaglin (a different person than the Defendant), testified that he visited with his father that evening as well, and when he left the home at about 7:00 p.m. or 7:15 p.m., his father had no injuries.

After the victim's body was discovered on Monday morning and multiple family members provided investigators with information about the dispute between the victim and the Defendant, investigators questioned the Defendant on Monday afternoon about his activities that weekend. The investigators reported that the Defendant had a visible injury on the right side of his face and his right hand was swollen. Both of his hands had noticeable discoloring with small abrasions. Photographs of the Defendant's face and hands were taken and submitted as evidence during his trial.

The Defendant gave varying versions of his activities on Sunday, July 16, 2006. He initially stated that after being dropped off by Deirdre at his mother's home that morning, he changed clothes, left to party with friends, and returned to his mother's home later that afternoon when it was still daylight. He also claimed that he went to Al's Grocery store for beer and had a physical altercation there with his

wife, from whom he was separated. He claimed to have been possibly scratched and/or hit in the face by her there and to have injured his hand during that fight. His wife denied that this ever occurred.

The Defendant claimed that he then left Al's Grocery and went to his friend Nicole's house. Later that evening, Nicole and two other friends drove him to his mother's house for a change of clothes, then they all drove to Lafayette to go out partying. He claimed to have returned to Nicole's house, which is where he spent the night. The Defendant stated he and Nicole shared a cab at about 7:30 a.m. when she left the house for work. After she was dropped off at work, he stated he was driven to Al's Grocery. From there, he claimed to have walked to his mother's house, called in to work to report that he was not coming in, and gone back to Al's Grocery where he remained until approximately 11:00 a.m. He stated that at that time he and a friend left the store for that friend's apartment.

On July 18, 2006, after autopsy results were received by the investigators and additional interviews were completed, an arrest warrant was issued for the Defendant. He was arrested at his mother's home and informed of his rights. The Defendant initialed each paragraph and signed the Advice of Rights Form. It was noted on the form that the Defendant reported having consumed a thirty-two ounce beer, but the detective indicated that the Defendant was not observed as being intoxicated or unable to understand what he was doing.

In his second statement, the Defendant described the altercation with the victim without any significant differences from his first version. He also similarly described his activities on that Sunday morning, i.e., he returned to the victim's home to get clothes, the victim was home, and Deirdre prevented another physical altercation from occurring between them. He stated that Deirdre drove him back to

4

his mother's house. This time, he claimed to have gone to purchase beer, run into a friend, J.W., while out, and "hung out" with him until returning to his mother's house. He claimed to have been at his mother's house, with family, for the next several hours, except for occasional trips to the store for more beer.

Significantly, in this statement, the Defendant admitted to returning to the victim's home on Sunday afternoon. He stated that during one trip to the store for more beer, he walked to the victim's home to retrieve additional clothes. The Defendant claims that he entered the house, believing the victim was not home. He claimed that once he entered, the victim came out of the kitchen, swinging punches at him, which is when his face was scratched. He admitted to punching the victim but could not recall where he hit him. The Defendant stated that all he could remember, thereafter, was grabbing the victim around the neck with both hands and pushing him, referring to his actions as a martial arts move. The victim fell backwards to the floor, landing in a seated position next to the sofa. Later in his statement, the Defendant stated that he only defended himself. He stated that he only pushed the victim and did not try to kill him. He left the house and walked to his friend Nicole's house. He admitted to lying and telling Nicole that the scratch on his face was caused by his wife.

Nicole testified that the Defendant arrived at her house at approximately 6:00 or 7:00 on Sunday night. Several people were there drinking and partying, and she was uncertain whether the Defendant left her home after that and returned. However, she was able to corroborate the Defendant's claim that she and other friends drove him from her house to his mother's house later that evening to get a change of clothes; that they all went out to nightclubs at about 9:00 p.m.; and that, upon returning to her home, the Defendant slept at her house.

## LAW AND DISCUSSION

### Insufficiency of the Evidence

The Defendant argues that the evidence presented at trial was insufficient to sustain his conviction for second degree murder. The analysis for a claim of insufficient evidence is well-settled:

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979); *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See State ex rel. Graffagnino*, 436 So.2d 559 (citing *State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371.

Second degree murder is defined by La.R.S. 14:30.1(A)(1) as the killing of a human being "[w]hen the offender has a specific intent to kill or to inflict great bodily harm." The Defendant contends that the State did not prove that he was the perpetrator of the crime and that the evidence is strictly circumstantial. He complains that no physical evidence was ever recovered to link him to the crime. The Defendant asserts that it would have been highly unusual not to find the victim's blood on the Defendant's clothing because the blood on the outside of the victim's mouth probably would have been expelled during the confrontation. Also, the Defendant points out

that the victim's fingernail clippings did not contain the Defendant's DNA. Lastly, the Defendant complains that no one saw him at the victim's home between 5:00 p.m. on Sunday and 3:00 to 4:00 a.m. on Monday.

In support of his argument, the Defendant refers to *State v. Marcantel*, 00-1629, p. 9 (La. 4/3/02), 815 So.2d 50, 56, wherein the supreme court stated, "[w]here there is no physical evidence to link a defendant to the crime charged, the testimony of one witness, if believed by the trier of fact, is sufficient support for a factual conclusion required for a verdict of guilty." As such, the Defendant deduces that the testimony of one witness is sufficient proof that he is not guilty.

The State maintains that both direct and circumstantial evidence was presented at trial. The direct evidence, as argued by the State, was that of the victim's injuries, including a blow to his throat sufficient to fracture his larynx, an act to which the Defendant admitted. Further, the State asserts that although the fractured larynx did not completely disable the victim, "the subsequent manual strangulation of the victim 'blended' with the circumstance surrounding the fracture of the larynx sufficient to warrant a reasonable inference that the two separate processes (the fracture of the larynx and the manual strangulation) occurred simultaneously."

The Defendant's assertion that it would have been highly unusual not to find the victim's blood spewed on the Defendant's clothing during the confrontation is not supported by the record. Dr. Trant testified at trial that it was feasible, but not likely, for blood to have been ejected if the victim was huffing and puffing after getting hit in the mouth. Dr. Trant also stated that it was possible that the victim might not have spewed blood at all, but swallowed it. Furthermore, there was no testimony or evidence to indicate that the victim was huffing and puffing after being struck in the mouth. This was simply a hypothetical question posed to Dr. Trant.

Considering the testimony and evidence presented at trial, the evidence was sufficient to convict the Defendant of second degree murder. The only element of the crime that the Defendant challenges is his identity as the offender. The Defendant is correct in his contention that there was no physical evidence presented at trial to link him to the crime. Although the State argues that evidence of the injuries to the victim's neck was physical evidence linking the Defendant to the crime, this evidence simply does not reflect that the Defendant inflicted the injuries.

As noted by the supreme court in *State v. Brown*, 03-897, p. 22 (La. 4/12/05), 907 So.2d 1, 18, *cert. denied*, 547 U.S. 1022, 106 S.Ct. 1569 (2006):

> When circumstantial evidence is used to prove the commission of the offense, La.R.S. 15:438 requires that "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." [*State v.*] *Neal*, [00-674], 796 So.2d [649] at 657. Ultimately, all evidence, both direct and circumstantial must be sufficient under *Jackson* to prove guilt beyond a reasonable doubt to a rational jury. *Id*. (citing *State v. Rosiere*, 488 So.2d 965, 968 (La.1986)).

*See also State v. Schneider*, 07-943 (La.App. 3 Cir. 4/2/08), 981 So.2d 107, *writ denied*, 08-942 (La. 12/12/08), 997 So.2d 558. In this case, the record clearly indicates that the victim struck the Defendant in the head with a hammer on the day prior to his death. Also, the record is replete with testimony that the Defendant was so angry about the incident he expressed his desire to kill the victim. Additionally, the Defendant admitted to going to the victim's home Sunday evening, within the window of time of his death, and pushing the victim on the neck using a martial arts move. Also, the testimony indicates that it was possible that the Defendant went to the victim's home around 6:30 to 7:30 Sunday evening. Lastly, the medical evidence indicated that the time of death occurred between 5:00 Sunday evening and 4:00 Monday morning. Without any reasonable hypothesis of innocence, the

circumstantial evidence was sufficient to prove the Defendant's guilt beyond a reasonable doubt.

## Motion to Suppress

The Defendant argues that the trial court erred in denying his motion to suppress his second statement, given on July 18, 2006. Specifically, the Defendant asserts that the testimony of Howard Francis indicates that he and the Defendant drank beer and smoked five rocks of crack cocaine prior to the time that the Defendant gave his second statement to authorities. As such, the Defendant maintains that amount of cocaine had some bearing on his ability to freely and voluntarily waive his right to make a statement.

In *State v. Brooks*, 505 So.2d 245, 247 (La.App. 3 Cir. 1987), this court stated:

> Before a confession can be introduced into evidence, the state has the burden of proving that the confession was free and voluntary. La.R.S. 15:451. Where the free and voluntary nature of a confession is challenged on the ground that the accused was intoxicated at the time of interrogation, the confession will be rendered inadmissible only when the intoxication is of such a degree as to negate defendant's comprehension and to render him unconscious of the consequences of what he is saying. Whether intoxication exists and is of a degree sufficient to vitiate the voluntariness of the confession is in the first instance a question for the trial judge. His conclusions on the credibility and weight of the testimony relating to the voluntariness of a confession will not be overturned unless they are not supported by the evidence. *State v. Robinson*, 384 So.2d 332, 335 (La.1980).

Although this particular issue was not raised in the Defendant's motion to suppress, the issue was raised at trial and testimony in support of the motion was presented prior to the introduction of both statements. Howard Francis, a friend of the Defendant, was called to testify for the defense. Howard stated that he was with

the Defendant around 8:30 to 9:00 a.m. on Monday, July 17, 2006, drinking beer at Bunny's store. After drinking a few beers, the two men left Bunny's, went to Howard's house, and shared five to six rocks of cocaine. After the Defendant left, the police arrived around 9:30 a.m. and spoke with Howard. Despite the amount of cocaine the two men smoked, Howard maintained at the hearing that he was not too intoxicated to talk to the police that day, stating, "I was good." Howard did not recall how much the Defendant had to drink that morning, but believed that the two men drank the same amount.

Detective Bea Moore testified that she took two statements from the Defendant in a two-day time frame. She did not have a warrant for his arrest, nor was the Defendant under arrest when she spoke with him on July 17, 2006. Detective Moore advised the Defendant of his rights because he had been living at the victim's home and because she had learned of the altercation. The Defendant initialed each paragraph and signed the Advice of Rights form and agreed to give his statement. Detective Moore was aware that the Defendant had been drinking that day and she indicated on the form that he had been drinking twelve-ounce bottles of Budweiser. The recorded statement began at 6:59 p.m. Detective Moore maintained that the Defendant did not display any signs of intoxication, such as slurred speech or falling asleep, to the point where he would not know what he was doing or signing.

The Defendant's second statement was taken by Detective Moore on July 18, 2006, following his arrest. The Defendant was advised of his rights, and he initialed and signed the Advice of Rights form at 6:19 p.m. At that time, he indicated to Detective Moore that he understood his rights. According to the transcript, the statement began at 6:49 p.m. When asked if he had taken any drugs or consumed alcohol, the Defendant informed Detective Moore that he had one thirty-two-ounce

10

Miller beer. Detective Moore testified that she did not detect any behavior that would indicate that the Defendant was too intoxicated to continue with the interview.

The Defendant is clearly incorrect in his assertion that he smoked crack cocaine on the day of his second statement. Howard's testimony indicates that the two men smoked the cocaine on Monday, July 17, 2006, the day *prior* to the Defendant's second statement. Also, even if the Defendant believed that the cocaine influenced his first or second statement, the first statement was taken at 6:59 p.m., almost ten hours after he allegedly smoked the cocaine. Accordingly, the trial court's conclusions on the credibility and weight of the testimony relating to the voluntariness of the Defendant's second statement will not be disturbed. We affirm the trial court's denial of the Defendant's motion to suppress.

## CONCLUSION

The Defendant's conviction is affirmed.

**AFFIRMED.**