# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 10-237

**STATE OF LOUISIANA**

**VERSUS**

**MICHAEL JASON MILLER**

**\*\*\*\*\*\*\*\*\*\***

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 15272-08
HONORABLE DAVID ALEXANDER RITCHIE, DISTRICT JUDGE

**\*\*\*\*\*\*\*\*\*\***

## ELIZABETH A. PICKETT
## JUDGE

**\*\*\*\*\*\*\*\*\*\***

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Sylvia R. Cooks, and Elizabeth A. Pickett, Judges.

**AFFIRMED AND REMANDED WITH INSTRUCTIONS.**

John Foster DeRosier
14th JDC District Attorney
Carla Sue Sigler
Assistant District Attorney
P. O. Box 3206
Lake Charles, LA 70602-3206
(337) 437-3400
Counsel for State-Appellee:
State of Louisiana

Mark Owen Foster
Louisiana Appellate Project
P. O. Box 2057
Natchitoches, LA 71457
(318) 572-5693
Counsel for Defendant Appellant:
Michael Jason Miller

**PICKETT, Judge.**

## FACTS

At the end of January 2007, the victim, eighty-five-year-old Hazel Bergeron, answered a knock at her door. She testified a man was at her door wearing a mask made out of "funny papers" and he asked to come in and use the telephone because he had car trouble. Mrs. Bergeron said she recognized him because he had done repair work at her house in December 2006. She knew his voice, and part of his face was exposed.[1]

Mrs. Bergeron did not let the defendant, Michael Jason Miller, in, but he broke the door and entered. Another man also came in. She thought it was someone else who had done repair work there. She screamed, and the defendant stuffed a towel in her mouth. After getting $5 and a blank check, the defendant put a knife to her throat, and he also threatened to come back with a gun if she reported the crime. The defendant beat Mrs. Bergeron severely. During the ordeal, she lost consciousness, so she did not remember being beaten. The defendant left her on the floor.

On February 2, 2007, at about 12:20 a.m., one of Mrs. Bergeron's sons, Dr. Joseph Bergeron, came to the house. He had just arrived from out of town to attend a family wedding. Mrs. Bergeron was curled up on the floor, in a pool of her own blood. Her face was heavily bruised, and there was blood on her head. Dr. Bergeron, who had experience as an emergency room physician, estimated that his mother had lain there for more than thirty hours.

Mrs. Bergeron was hospitalized first in Lake Charles, then in Beaumont, Texas. She had an intra-cranial injury, a broken pelvis, and hypothermia. The police

---

[1] At the time of the trial, the victim was dead. However, her testimony was perpetuated and played for the jury on DVD.

1

investigation at her home revealed that the telephone lines had been cut, and her door was damaged. Also, police learned that the defendant had tried to use Mrs. Bergeron's credit card at a local Wal-Mart.

On June 17, 2008, the Calcasieu Parish District Attorney's Office filed a bill of information charging the defendant with attempted second degree murder and aggravated burglary. His wife was also charged but was not tried with him, and thus is not a subject of this appeal. His first trial ended in a mistrial on May 7, 2009.

A new jury was selected on June 22-24, 2009. On the latter date, it began hearing evidence. On June 26, the jury found the defendant guilty as charged.

On October 28, 2009, the trial court heard argument regarding the defendant's motions for new trial and for acquittal. It denied both motions. The defendant then waived sentencing delays, and the court conducted a habitual offender proceeding. At the close of that hearing, the court found the defendant to be a second habitual offender.

The court sentenced the defendant to seventy-five years at hard labor for attempted second degree murder and sixty years at hard labor for aggravated burglary, with the sentences to run concurrently.[2] The court also revoked the defendant's probation from an earlier conviction. On October 30, 2009, the defendant filed a motion to reconsider sentence, which the court denied on the same date.

The defendant now appeals his convictions, assigning four errors.

<u>**ASSIGNMENTS OF ERROR**</u>

1. The state failed to establish all of the elements of proof that Michael Jason Miller was guilty of attempted second degree murder.

---

[2]The trial court's remarks indicated that only the attempted murder conviction was enhanced. However, the aggravated burglary sentence apparently was enhanced also since that offense normally carries a maximum of thirty years. La.R.S. 14:60.

2

2.  The prosecution and conviction of Michael Jason Miller for both attempted second degree murder and aggravated burglary violated his constitutional protection against double jeopardy.

3.  The trial court erred in denying Michael Jason Miller's motion to remove Mrs. Morris Hunter as a juror.

4.  The trial court erred in denying Michael Jason Miller's objection to Dr. Joseph Bergeron providing hearsay testimony.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed by this court for errors patent on the face of the record.  After reviewing the record, we find one error patent concerning the advisement of the time limitation for filing an application for post-conviction relief.

The trial court provided insufficient information regarding the time period for filing an application for post-conviction relief.  The court minutes of sentencing state, "The Court advises the defendant of the prescriptive period for filing post conviction relief and he states he understands."  However, the sentencing transcript indicates the defendant was not fully advised of the time limitation of La.Code Crim.P. art. 930.8.  After initially advising the defendant that he would have three years to file an application for post-conviction relief, the court stated:

> I'm sorry, two years, two years, in which to file your application for post-conviction relief and that's in article 930 of the *Code of Criminal Procedure* and subsequent articles.  I mean 930 et seq.  And you can ask your attorney for more information about that.

Louisiana Code of Criminal Procedure Article 930.8 states that the time period for filing an application for post-conviction relief is two years, which begins to run when the judgment of conviction and sentence become final under the provisions of La.Code Crim.P. arts. 914 or 922.  It is not clear from the trial court's comments that the two year prescriptive period begins to run only when the conviction and sentence

3

are final. The trial court is instructed to inform the defendant of the correct provisions of article 930.8 by sending appropriate written notice to the defendant within ten days of the rendition of this opinion and to file written proof in the record that the defendant received the notice.

## ASSIGNMENT OF ERROR NO. 1

In his first assignment of error, defendant argues the evidence adduced at trial was insufficient to support his conviction for attempted second degree murder. Specifically, he contends the evidence does not demonstrate that he had the specific intent to kill Mrs. Bergeron. Specific intent to kill is an essential element of attempted second degree murder. *See, e.g., State v. George*, 09-143 (La.App. 3 Cir. 10/7/09), 19 So.3d 614.

The analysis for sufficiency claims is well-settled:

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979); *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See State ex rel. Graffagnino*, 436 So.2d 559 (*citing State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371.

The defendant acknowledges that Mrs. Bergeron suffered serious injuries, and concedes that the evidence could show that he had the intent to hurt her. However, he

4

argues there was no testimony that Mrs. Bergeron's injuries indicated he had the specific intent to kill her.

Second degree murder is defined in La.R.S.14:30.1, which states, in pertinent part:

> A. Second degree murder is the killing of a human being:
>
> (1) When the offender has a specific intent to kill or inflict great bodily harm.

Attempt is defined in La.R.S. 14:27, which states, in pertinent part:

> Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose.

Specific intent is an element of second degree murder. "[S]pecific intent to inflict great bodily harm may support a conviction for murder, but in order to support a conviction for attempted murder, only specific intent to kill is sufficient." *State v. Mitchell,* 99-3342, p. 5 (La. 10/17/00), 772 So. 2d 78, 82 (citation omitted).

"Specific intent is a state of mind and as such, it need not be proven as a fact, but may be inferred from the circumstances of the transaction and the actions of the defendant." *State v. Williams*, 383 So.2d 369, 373 (La.1980), *cert. denied*, 449 U.S. 1103, 101 S.Ct. 899 (1981); *see also* La.R.S. 14:10(1).

In order to convict the defendant for the crime of attempted second degree murder, the state carried the burden of proving beyond a reasonable doubt that the defendant had the specific intent to kill Mrs. Bergeron and committed an act for the purpose of and tending directly toward the accomplishment of killing Mrs. Bergeron. The defendant in this matter first cut Mrs. Bergeron's phone lines to prevent her from calling for assistance and then forcibly entered her home. After demanding valuables

5

and money, he stuffed a towel in her mouth to prevent her from screaming, held a knife to her throat and threatened to kill her, and beat her severely. The jury heard Mrs. Bergeron's testimony as to what happened to her that night. They had the opportunity to view the photographs that reflected the severity of the beating she received. Her son, a physician, described his mother's condition when he found her, lying in a pool of blood and vomit, where she had been for at least 30 hours. Although prior to this attack she had been fully mobile and able to see to all of her own needs, this attack rendered her totally incapacitated. Dr. Steven Hedlesky, who treated Mrs. Bergeron at the emergency room, described her condition when she arrived at the hospital for treatment. He testified that when she arrived she was in critical condition and was in danger of immediate death. She was suffering from hypothermia and had multiple serious injuries and unstable vital signs. She suffered from a traumatic subarachnoid hemorrhage, i.e., bleeding around the brain, from a traumatic injury to her head. She also had pelvis fractures and facial contusions. He specifically testified that her injuries were life threatening.

Considering all the evidence, including the severity of the beating the defendant inflicted upon Mrs. Bergeron and the life-threatening nature of her injuries, we find there was sufficient evidence for the jury to conclude that the defendant had the specific intent to kill Mrs. Bergeron.

This assignment of error lacks merit.

**ASSIGNMENT OF ERROR NO. 2**

In his second assignment of error, the defendant argues his convictions for attempted second degree murder and aggravated burglary constituted double jeopardy. He points out that the bill relied upon the battery of the victim to support the

6

aggravated burglary charge, and argues that said battery was also the substance of the attempted murder charge.

This court has recently discussed double jeopardy, as follows:

> Both the United States and Louisiana Constitutions prohibit double jeopardy; the imposition of multiple punishments for a single criminal act. *See* U.S. Const. amend. V; La. Const. art. 1, § 15. *See also*, La.Code Crim.P. art. 591. Louisiana courts use two methods, the "Blockburger Test" and the "same evidence test", to determine whether double jeopardy exists. *State v. Williams*, 07-931 (La.2/26/08), 978 So.2d 895.
>
> In *Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932), the United States Supreme Court interpreted the Fifth Amendment's prohibition of double jeopardy and enunciated the following test to be employed by the federal courts, as follows:
>
>> The applicable rule is that, where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one is whether each provision requires proof of an additional fact which the other does not.
>
> In interpreting Article 1, Section 15 of the Louisiana Constitution, Louisiana courts have also used the broader "same evidence test" which provides:
>
>> If the evidence required to support a finding of guilt of one crime would also have supported conviction of the other, the two are the same offense under a plea of double jeopardy, and a defendant can be placed in jeopardy for only one. The test depends on the evidence necessary for conviction, not all the evidence introduced at trial.
>
>> *State v. Cotton*, 00-850, p. 5 (La.1/29/01), 778 So.2d 569, 573, quoting *State v. Steele*, 387 So.2d 1175, 1177 (La.1980).

*State v. Archield*, 09-1116, p. 4 (La.App. 3 Cir. 4/7/10), 34 So.3d 434, 438.

The defendant appears to rely upon the "same evidence" test, stating, "[i]n the present case, there is only evidence of the underlying battery." The crime of aggravated burglary is found at La.R.S. 14:60, which states, in pertinent part:

7

Aggravated burglary is the unauthorized entering of any inhabited dwelling, or of any structure, water craft, or movable where a person is present, with the intent to commit a felony or any theft therein, if the offender,

(1) Is armed with a dangerous weapon;  or

(2) After entering arms himself with a dangerous weapon; or

(3) Commits a battery upon any person while in such place, or in entering or leaving such place.

In order to find the defendant guilty of aggravated burglary, the jury had to find evidence that proved beyond a reasonable doubt that the defendant made an unauthorized entry into Mrs. Bergeron's home, while she was present, with the intent to commit a felony or a theft therein and that he was 1) armed with a dangerous weapon, or 2) after entering her home armed himself with a dangerous weapon, or 3) committed a battery upon her while there.

Mrs. Bergeron testified that the defendant forcibly entered her home, breaking in the door after she denied him entry.  After entering the home he demanded her valuables.  She told him where her wallet was and he removed the $5.00 from her wallet and demanded more money telling the victim "you know you have more than that."  She then gave him a coin purse which she said contained, among other things, an undetermined number of one-hundred-dollar bills.  The defendant held a knife to her throat and threatened to kill her, and she told him to take whatever he wanted and go.  Because Mrs. Bergeron was screaming, the defendant stuffed a rag in her mouth.  Before the defendant left, Mrs. Bergeron sustained the severe beating that formed the basis of the attempted second degree murder charge and is more completely discussed above.  The defendant later tried to use Mrs. Bergeron's credit card to make purchases at a local discount store.

8

These facts, when viewed in a light most favorable to the prosecution, as per *Jackson*, clearly establish proof of all the elements of aggravated burglary. They are separate and apart from any of the evidence of the attempted second degree murder of the victim. The defendant could have been convicted of aggravated burglary without proof that an attempted second degree murder occurred. The evidence shows that the offense of aggravated burglary and the offense of attempted second degree murder were two separate and distinct crimes committed although they were committed in the same course of events.

Because separate and distinct evidence was presented for both crimes, we find the conviction for both the offense of aggravated burglary and the offense of attempted second degree murder did not subject the defendant to double jeopardy.

This assignment of error lacks merit.

**ASSIGNMENT OF ERROR NO. 3**

In his third assignment of error, the defendant argues that one of the jurors should have been removed, because she knew the defendant's ex-wife, who was a state witness. After opening statements, the following colloquy took place:

THE COURT:

Ladies and gentlemen, I'm going to ask you to please just go outside the courtroom just for a moment.

[JURY REMOVED FROM THE COURTROOM]

THE COURT:

All right. Mrs. Hunter, I need you to tell me on the record what it is that you told the deputy just a moment ago.

MRS. HUNTER:

9

I just realized when the girl walked in a little bit ago that she is my new granddaughter-in-law's sister, which is his ex-wife, and I just don't want there to be a problem.

THE COURT:

Well, how did you know that's his ex-wife?

MRS. HUNTER:

It's Marcantel. Rhonda Marcantel, was that her name?

THE COURT:

Sara I believe is her name.

MRS. HUNTER:

I saw them at the rehearsal dinner Friday night and at the wedding Saturday.

THE COURT:

Okay.

MRS. HUNTER:

And that's really the first time that I've seen them.

THE COURT:

Okay.

MRS. HUNTER:

I just wanted you to know in case something came up. I don't want to hide anything.

THE COURT:

No, I understand that. So -- but you didn't recognize when we were talking during jury selection, you didn't recognize the names or anything like that?

MRS. HUNTER:

No, I did not. I did not.

THE COURT:

Okay. Let me ask you this.  So what's that relationship again?

MRS. HUNTER:

It's my step-grandson's new wife's sister.

THE COURT:

Okay. And what's your step-grandson's wife's name?

MRS. HUNTER:

Randi  Mercantile.

THE COURT:

Randi's a girl?

MRS. HUNTER:

Randi is a girl.

THE COURT:

Okay. All right. Now let me ask you this. Your step-grandson, are you close to him?

MRS. HUNTER:

Yes.

THE COURT:

I mean how often do you see him?

MRS. HUNTER:

Relatively often. We don't consider step in our family and they're just all my grandchildren.

THE COURT:

Okay, but I'm trying to get an idea of who -- I mean how long have you known him?

MRS. HUNTER:

11

Fifteen, seventeen years I suppose. As long as my daughter and his dad were married -- have been married.

THE COURT:

Okay. And how often have you seen them?

MRS. HUNTER:

I see them frequently. I see them at my daughter's all the time. I've known Randi for two or three years now, as long as she and Nicholas have been going together.

THE COURT:

I'm sorry, I just missed what you said about how often you see him. How often is that?

MRS. HUNTER:

I see him frequently. When I go out to my daughter's they're there very often and I see them frequently. I don't know her sister and I don't know her parents.

THE COURT:

Okay, and I guess that was going to be my next question, and so you don't know her sister.

MRS. HUNTER:

No.

THE COURT:

You know, I don't know if -- you know, let me say this. I mean, you know, siblings can be as different as night and day or they can be just the same or anything.

MRS. HUNTER:

Correct.

THE COURT:

So because you know her sister really and you saw her the other day for the first time, like at the --

MRS. HUNTER:

Right, this past weekend when my grandson was married.

THE COURT:

Okay. And you don't know her parents? Have you ever met her parents?

MRS. HUNTER:

Not until Friday night.

THE COURT:

Okay. Anything --

MRS. HUNTER:

I can't tell you his first name honestly.

THE COURT:

Okay. So let me ask you this. Would there be anything about that relationship since you don't know the defendant's ex-wife, you don't know his parents, and those would be the people who would be coming in here,--

MRS. HUNTER:

Yes, sir.

THE COURT:

--all right, would that affect you at all in this case? Would you be more inclined to believe them--

MRS. HUNTER:

No.

THE COURT:

--because of that relationship?

MRS. HUNTER:

13

No. I just wanted -- I don't want anything under the table. I wanted to make sure–

THE COURT:

No, ma'am,--

MRS. HUNTER:

--you all knew.

THE COURT:

--you did the right thing. You did the right thing, just so we can put it out on the table, but because of that I have to ask you these questions just to make sure.

MRS. HUNTER:

Right.

THE COURT:

So are you telling me that, and I think you just did, but I just want to just make sure that it's clear, that -- so you just said you don't know him. You've met them the other night.

MRS. HUNTER:

Yes.

THE COURT:

Is that about it? You've met them, said hello to them, and --

MRS. HUNTER:

That's about it. Sat at the table with them.

THE COURT:

Okay. Did y'all talk about anything in particular?

MRS. HUNTER:

No.

THE COURT:

14

Okay. That's the only time you've met them in the two or three years that your step-grandson has been dating–

MRS. HUNTER:

Yes.

THE COURT:

--his --

MRS. HUNTER:

Yes.

THE COURT:

Okay. His new wife? They just -- he just got married or they got married yet?

MRS. HUNTER:

They got married last Saturday.

THE COURT:

Okay. And do you feel -- would you -- let me ask you this question. I mean do you feel like you would have to answer to -- you would feel awkward at all? Let's just say you felt like the State didn't prove their case when it was all said and done and if those folks testified on behalf of the State would you feel like you had any -- would you feel like you would have to answer to them later on if you voted or you returned a verdict of not guilty for Mr. Miller?

MRS. HUNTER:

No. No, I don't have feelings either way. I don't have a problem either way. I just didn't want something to come up later on and it be my fault.

THE COURT:

No, no, no, no, no. I understand, I understand. So this -- well, I guess what I just want to make sure is are you saying this doesn't affect your ability to be fair and impartial to Mr. Miller and to the State; is that right?

MRS. HUNTER:

15

No, it does not.

THE COURT:

Okay. Do you feel like the fact that you saw her and recognized her, I know you wanted us to know, but what you're telling me is that that doesn't affect you at all--

MRS. HUNTER:

No.

THE COURT:

--in your ability to serve as a juror in this case?

MRS. HUNTER:

No.

. . . .

THE COURT:

Well, what was your last thing that you said? I believe Ms. Spees asked you would you have some concerns if it did?

MRS. HUNTER:

If it caused a ripple effect with Randi. Of course I would have concerns.

THE COURT:

But do you have any belief at all that it would?

MRS. HUNTER:

I don't think it would. I don't think it would.

This court has previously addressed a similar issue:

Defendant alleges that the trial court erred when it did not grant his motion for a new trial based on the fact the jury foreman failed to disclose a relationship with a member of the victim's family. In his motion for a new trial, Defendant asserted:

Additionally, the foreman of the jury which convicted this defendant, misled the defense counsel about his knowledge of this case. It is in fact alleged that the foreman of this jury has, both in the past and present, a close relationship to the victim's family. This relationship not only stems to friendship, but in-house visits and business relationships with the alleged victims [sic] family.

. . . .

Before an accused can challenge a juror because of a connection or relationship between the juror and one of the participants of a trial, it must be shown that the relationship was such that would preclude the juror from arriving at a fair verdict. *State v. Wilson*, 01-625 (La.App. 3 Cir. 12/28/01), 806 So.2d 854, *writ denied*, 02-323 (La.9/13/02), 827 So.2d 1121. *See also State v. Chapman*, 410 So.2d 689 (La.1981).

In *Wilson*, the appellant claimed the trial court erred when it refused to dismiss a juror who revealed that she knew the sister of one of the State's witnesses. In fact, the sister often stayed with the juror in her house. This court did not find error, citing *State v. Weaver*, 99-2177, pp. 6-7 (La.App. 4 Cir. 12/6/00), 775 So.2d 613, 618, *writ denied*, 01-70 (La.6/27/03), 847 So.2d 1255, which in turn cited *State v. Holland*, 544 So.2d 461 (La.App. 2 Cir.1989), *writ denied*, 567 So.2d 93 (La.1990), as follows:

A trial judge is granted great discretion in determining whether to seat or reject a juror for cause, and such rulings will not be disturbed without a showing of an abuse of that discretion. *State v. Jones*, 474 So.2d 919 (La.1985). Disclosure during the trial that a juror knows or is related to a witness or the victim is not sufficient to disqualify a juror unless it is shown that the relationship is sufficient to preclude the juror from arriving at a fair verdict. *State v. Peterson*, 446 So.2d 815 (La.App. 2d Cir.1984). The connection must be such that one must reasonably conclude that it would influence the juror in arriving at a verdict. *State v. Hodgeson*, 305 So.2d 421 (La.1974).

*Wilson*, 806 So.2d at 862.

In the current case, the trial court asked Mr. Sheppard whether he ever discussed the case with D.G. He answered, "No." The trial court then asked if in anyway the rental agreement was tied into the case. Again, he answered, "No."

We find the trial court did not abuse its discretion when it deemed the juror was forthcoming with his disclosure at trial. The Defendant failed to show the jury foreman had a close personal and business

relationship with the victim's family as claimed, or that the connection between the juror and the victim's step-uncle was such that would have influenced the juror's decision as to Defendant's guilt or innocence. Accordingly, this assignment is without merit.

*State v. Mayeux*, 06-944, pp. 16-17, 19-20 (La.App. 3 Cir. 1/10/07), 949 So.2d 520, 531-34.

In the present case, the record shows that Mrs. Hunter had a familial connection to an important state witness. However, it does not show that she had the kind of personal relationship with the witness that would influence her decision regarding the defendant's guilt or innocence. Therefore, the assignment lacks merit.

## ASSIGNMENT OF ERROR NO. 4

This assignment of error is not briefed. Therefore, it is considered abandoned. Uniform Rules—Courts of Appeal Rule 2-12.4.

## CONCLUSION

The convictions are affirmed.

The trial court is instructed to inform the defendant of the correct provisions of La.Code Crim.P. art. 930.8 by sending appropriate written notice to the defendant within ten days of the rendition of this opinion and to file written proof in the record that the defendant received the notice.

**AFFIRMED AND REMANDED WITH INSTRUCTIONS.**

18