425 So.2d 1228 (1983)
STATE of Louisiana
v.
Nathaniel RICHARDSON, Jr.
No. 82-KA-0202.
Supreme Court of Louisiana.
January 10, 1983.
William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Harry F. Connick, Dist. Atty., Louise Korns, Richard Petre, Jeffrey Bassett, John H. Craft, Asst. Dist. Attys., for plaintiff-appellee.
Howard McCurdy, Dwight Doskey, Orleans Indigent Defender Program, New Orleans, for defendant-appellant.
DIXON, Chief Justice.
On April 18, 1981 Nathaniel Richardson, Jr., a twenty-six year old black male, was charged by bill of information with the crime of forcible rape of a twenty-one year old New Orleans woman (who will be referred to hereafter as Jane Brown) in violation of R.S. 14:42.1. After waiving his right to a jury trial, defendant was tried before a judge on June 30 and July 10 and found guilty as charged. His motion for a new trial was denied, and he was sentenced to serve two years at hard labor without benefit of probation, parole or suspension of sentence. Defendant now appeals, arguing one assignment of error.
*1229 The victim, her boyfriend Michael Smith (fictitious name) and her friend Marie attended a concert sometime after 10:00 p.m. on April 17, 1981. On the way to the concert the trio smoked marijuana, but at the concert they neither smoked marijuana nor consumed any alcohol. When the concert ended at 2:00 a.m., Michael and Jane first dropped Marie off at Michael and Jane's apartment and then proceeded to Johnny White's Bar where they stayed until 4:30 a.m. After leaving the bar, Michael and Jane decided to have breakfast at "Molly's." Jane ordered breakfast while Michael ordered another cocktail. While Jane was eating, Michael spotted "Jerome" (Nathaniel Richardson), the defendant herein, "milling around." Michael walked outside and asked Jerome to sing him a song. Michael testified that he had talked to Jerome several times over the past months requesting favorite songs and watching him sketch. Jane stated at trial that she had talked to Jerome briefly once two weeks earlier. After Jane finished her breakfast, she joined Michael and Jerome outside. Michael asked Jane if Jerome could stay at their apartment since "Jerome didn't have a place to stay." Jane agreed since Michael acknowledged that he knew Jerome.
They left "Molly's" and smoked marijuana in the car on the way back to the apartment. When they returned to the apartment around 8:00 a.m., they found Marie exercising on the living room floor. For the next hour Marie continued her exercises and talked to Jane while Michael watched cartoons on television in the bedroom. Jerome stood on the balcony staring at Marie "licking his lips and making very vulgar faces, bulging his eyes, ... rather obscene[ly]" so Marie stopped exercising. Michael asked Marie to call his employer to report that he would not be able to come in to work. After she completed this telephone call and after Jerome attempted "to make a pass at her,"[1] Marie left around 8:45 a.m. for her home in Thibodaux.
Jane then retired to the bedroom with Michael where they began to have sexual intercourse, during which Jerome entered the bedroom through a french door opening onto the balcony. He attempted to join in Michael and Jane's lovemaking by "kissing [Jane] on the thigh." The couple had not been aware of Jerome's presence in the room until that intrusion. At that point Jane jumped up and either Jane or Michael screamed at Jerome to get out, so Jerome left the room.
Defendant entered the bedroom a second time approximately ten minutes later. This time Michael got out of bed, told Jerome to leave and chased him back into the living room.
Michael and Jane fell asleep about 11:00 a.m. The alarm awakened Jane at 12:00 p.m. since she was scheduled to be at work at 1:00 p.m. She got out of bed, put on her robe and walked to the bathroom to shower. She shut the bathroom door and sat down on the toilet. Suddenly, Jerome opened the door, walked into the bathroom and sat on the floor in front of Jane. Jane testified that she was shocked by his actions and told him, "Look, man, I wish you'd leave. I've got to take a shower. I've got to go to work." When Jerome refused to budge, Jane attempted to leave. As she stood up, Jerome grabbed her legs and put his face in her crotch. Jane struggled to free herself, but defendant threw her down on the floor. Although Jane screamed and hit defendant, he pinned her arms and had intercourse with her. According to Jane, the defendant also unsuccessfully attempted sodomy which caused her to bleed. After he released her, Jerome returned to the kitchen where he ate cheese and pears from the refrigerator. Jane remained in the bathroom for a few minutes since she was unsure of defendant's next move. Finally she ran from the bathroom to her bedroom to *1230 awaken Michael. She did not scream at this time for fear of waking Carolyn, a tenant who occupied the second bedroom.
Michael testified that Jane ran into their bedroom, crying hysterically and screaming at him, "Why did you let him rape me. He just raped me." Michael woke up, ran out of the bedroom and started swinging at Jerome. Defendant ran out of the apartment with Michael, naked, in pursuit. Half way down the stairs Michael realized that he was undressed so he ran back into the apartment to grab a towel. Michael caught up with Jerome on Decatur Street, punching him and calling him names. Jerome fled as Michael clutched for his towel.
Michael returned to the apartment, put on some shorts and resumed the chase. While searching for defendant through the shops in the French Quarter, Michael asked an off duty officer to contact the police. By the time Michael returned to the apartment, empty-handed, approximately twenty minutes later, two police officers were present questioning Jane and the tenant Carolyn.
After briefing the police officers, Michael left on his motorcycle to comb the French Quarter again. He finally spotted defendant at the corner of Ursuline and Decatur Streets. Defendant attempted to explain the situation to Michael who responded by fighting. After another foot chase, the pair collapsed from exhaustion. The police arrived and arrested defendant.
Defendant related a different version of the facts of this case, focusing on Jane's solicitation of and consent to sexual relations with him. Defendant testified that Jane approached him outside of "Molly's." She kissed him and allowed him to fondle her. Michael approached the two and informed defendant that "they had a free sort of relationship." Jerome then suggested that they "go to the hotel or wherever you live and smoke some pot and have a few drinks and we can have some sex, obviously, she's willing." Then the three left, smoking marijuana on the way to the apartment as well as six or seven joints after they arrived there. Defendant claimed that Jane undressed in his presence and encouraged him to touch her while Michael was calling in sick to work. When Michael returned to the bedroom, he observed the intimacy between Jane and Jerome, commenting, "Yeah, I can see you two are going to get along just fine." Defendant then left the bedroom to roll another joint. When he returned, Michael and Jane were making love. Defendant attempted to join in their lovemaking, but he stopped after Jane asked him what he was doing. He remained in the bedroom, smoking marijuana and observing the couple having sex. Since he felt that no one would believe what he had witnessed, defendant began to sketch the couple engaging in sodomy. Defendant was "too loaded" to complete his sketches and so he returned to the living room. A short time later Jane emerged from the bedroom in a short black house coat. Defendant expected her to come to the couch to have sex with him. Instead, she walked past defendant, stopped and glanced at him in an enticing manner. Defendant followed her into the bathroom where he proceeded to have cunnilingus with her. Then Jane laid down on the floor and defendant had intercourse with her, although he claimed that he did not reach a climax.
After this encounter, defendant walked out of the bathroom and into the kitchen. Approximately twenty minutes later, Jane, after showering and dressing for work, wandered into the kitchen where he was eating. After defendant teased her about her sexual activities with Michael, Jane returned to the bedroom where Michael was sleeping. Shortly thereafter, Michael charged out of the bedroom swinging at defendant and the pursuit through the French Quarter began.
Defendant first argues that the evidence adduced at trial was insufficient to support his conviction of forcible rape under the standard enunciated in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), that a reversal is proper where the evidence, viewed in the light most favorable to the state, could not be found by a rational *1231 trier of fact to support the verdict beyond a reasonable doubt. This standard of review has been applied consistently by this court to consider the sufficiency of the evidence. State v. Ennis, 414 So.2d 661 (La. 1982); State v. Stewart, 400 So.2d 633 (La. 1981); State v. Guillot, 389 So.2d 68 (La. 1980); State v. Landry, 381 So.2d 462 (La. 1980); State v. Mathews, 375 So.2d 1165 (La.1979); State v. Abercrombie, 375 So.2d 1170 (La.1979), cert. denied, Abercrombie v. Louisiana, 446 U.S. 935, 100 S.Ct. 2151, 64 L.Ed.2d 787 (1980).
Defendant was charged under R.S. 14:42.1 with the crime of forcible rape. This statute defines forcible rape as:
"[A] rape committed where the anal or vaginal sexual intercourse is deemed to be without the lawful consent of the victim because the victim is prevented from resisting the act by force or threats of physical violence under circumstances where the victim reasonably believes that such resistance would not prevent the rape."
Accordingly, in Louisiana, to prove a charge of forcible rape, the state has the burden of proving that (1) anal or vaginal intercourse occurred; (2) without the lawful consent of the victim; (3) the victim's resistance is prevented by force or threats of physical violence; and (4) the victim reasonably believes that such resistance would not prevent the rape. If each of these elements, when viewed in the light most favorable to the state, has been proved beyond a reasonable doubt, then the state has presented sufficient evidence to comply with Jackson v. Virginia, supra.
There was no dispute at trial that defendant engaged in sexual intercourse with the victim. Both the defendant and the victim testified that penetration occurred. Charles Crone, a criminalist with the New Orleans Police Department, testified that he discovered seminal fluid on both defendant's trousers and the victim's robe. Spermatozoa, however, was detected only on the victim's robe. Blood was not spotted on either the pants or the robe.
The crucial factual question centered on whether Jane consented to the physical act or whether she was forced to engage in intercourse against her will. Applying the standard of review set forth in Jackson v. Virginia, supra, the evidence in this case is sufficient to uphold the conviction of forcible rape. The victim testified that the sexual intercourse occurred without her lawful consent. She stated that she struggled with the defendant, but was pinned down and overpowered by him.
Her testimony that force was used was amply supported by the expert testimony of the examining physician. Dr. Cary C. Allison, an emergency medicine resident of Charity Hospital, testified that he examined the victim for evidence of a sexual assault at 6:30 p.m. on April 18, 1981. He detected two small three millimeter tears "at the junction of the dry sternal skin of the body meeting the wet mucosal skin of the vagina," which in his opinion were twelve hours old or less. The tears were suggestive of penetration with force or without the normal lubrication of a sexually excited female. A rectal examination was "negative for blood and palpable mucosal defects." Even though the physician discovered no bruises or abrasions, this discovery seems consistent with the testimony of the victim and her boyfriend that she did not "bruise that easy." Dr. Allison also recalled that Jane was anxious and distraught, "upset, angry and with a determination to see the thing through." The two policemen called to the scene verified the hysterical state of the victim immediately after the incident.
The victim testified that she screamed for help when the defendant attacked her. However, neither Carolyn nor Michael heard her cries for help. This failure to hear the screams was explained by the witnesses for the state. The apartment was located on a busy intersection in the French Quarter. A flea market was open for business directly across the street. One of the investigating officers observed a large noisy crowd roaming through the marketplace. The clamor from the street could be heard by the officer in the second floor apartment. At least one bathroom wall was *1232 brick; Michael testified that it was understandable why Jane was not heard since "she was in a closed room with alot of background noises."
The evidence indicates that the victim attempted to resist, but was prevented by force.[2] She reasonably believed that any further resistance would be useless since both her legs and her arms were pinned down, and her screams had been futile.
Viewing the evidence in the light most favorable to the state, a rational trier of fact could have found the evidence sufficient to find the defendant guilty of forcible rape beyond a reasonable doubt. Jackson v. Virginia, supra. The evidence presented at trial by the state consisted almost entirely of the testimony of the victim and her boyfriend. Their version of the facts, together with the expert testimony of the examining physician and the criminalist, amply supports a finding that force was used. Defendant's conduct in applying force to the victim's person, despite her cries for help and her active resistance, coupled with the defendant's admissions that intercourse occurred, well supports a conviction of forcible rape. State v. Turnbull, 377 So.2d 72 (La.1979).
In State v. Smith, 409 So.2d 271 (La.1982), this court held that the trial court erred in not suppressing a confession. Whether the state has borne its burden of proving a confession free and voluntary is a mixed question of law and fact.
In the case before us defendant asks that we evaluate the credibility of the witnesses and overturn the trial court on its factual determination of guilt. This is not the function of this court on appeal. La. Const. Article 5, § 5(C) (1974).
For these reasons, the conviction and sentence of defendant are affirmed.
NOTES
[1] Marie testified at trial as follows:

"Q What exactly did he do to make a pass at you?
A Well, he was suggestive in that I offered everybody some oranges and he left it go down his lip and started licking his lips and he kept saying, `Why don't you stay here?' And I kept saying that I had to go back home."
[2] At trial Jane testified as follows:

"Q How did you struggle?
A I was pushing him away with my hands and trying to get my legs free and I couldn't.
Q And after the struggle, what happened then?
A He threw me on the floor and I started yelling.
Q How did he throw you down?
A He just pushed me down. He had me in a way that he could push me down real easily. He had his arms around my legs like this. There was no way I could get free.
Q And then what happened?
A He threw me on the floor and then he pinned my arms and then he had intercourse."