# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 15-333

**STATE OF LOUISIANA**

**VERSUS**

**MICHAEL GUILLORY**

**\*\*\*\*\*\*\*\*\***
## APPEAL FROM THE
## FOURTEENTH JUDICIAL DISTRICT COURT
## PARISH OF CALCASIEU, DOCKET NO. 13755-14
## HONORABLE DAVID A. RITCHIE, DISTRICT JUDGE
**\*\*\*\*\*\*\*\*\***

## SYLVIA R. COOKS
## JUDGE

**\*\*\*\*\*\*\*\*\***

Court composed of Sylvia R. Cooks, James T. Genovese and John E. Conery, Judges.

**AFFIRMED.**

John F. DeRosier, District Attorney
Karen McLellan, Assistant District Attorney
901 Lakeshore Drive, Suite 800
Lake Charles, LA 70601
(337) 437-3400
**ATTORNEY FOR APPELLEE**
    State of Louisiana

William R. Thornton
Louisiana Appellate Project
P.O. Box 51992
Lafayette, LA 70505-1992
(337) 534-4656
**ATTORNEY FOR DEFENDANT/APPELLANT**
    Michael Guillory

**COOKS, Judge.**

Defendant, Michael Guillory, appeals the jury's verdict convicting him of forcible rape and indecent behavior with a juvenile.[1] The trial court sentenced Defendant as a second felony offender to fifty years at hard labor for forcible rape and ten years at hard labor for indecent behavior with a juvenile.

Defendant alleges one assignment of error: He contends the State "failed to prove that [he] committed the crimes alleged, beyond a reasonable doubt, because no rational juror could have found [him] guilty, based on the evidence adduced at trial."

On June 2, 2015, the State filed its response brief. The State acknowledged the case against Defendant contained discrepancies but countered that point by stating that the victims "never wavered from their testimony that they were attacked by the Defendant." The State maintained that its case excluded all reasonable hypotheses of innocence and that the jury's determination was rational.

Defendant's assignment of error requires an in-depth evaluation of the proof presented at trial to establish his guilt. Accordingly, we will thoroughly examine the evidence presented below to determine if Defendant's sufficiency of evidence challenge has merit.

## FACTS AND PROCEDURAL HISTORY

The State's first witness was Detective Jason Alexander, who was an investigator with the forensic unit of the Calcasieu Parish Sheriff's Office at the time of the incident. He testified that he reported to Lake Charles Memorial Hospital on October 13, 2007, regarding "sexual allegations against Michael Guillory" being made by two minor female victims, N.W. and M.R., which

---

[1]Defendant filed a motion to consolidate the matters captioned in docket numbers 15-333 and 15-334 for briefing purposes only. Docket number 15-333, addressed in this opinion, applies to Defendant's appeal of his conviction after a trial on the merits, and docket number 15-334 applies to Defendant's habitual offender proceedings and sentencing. This court granted the motion and ordered the matters consolidated for briefing purposes only.

occurred on or about October 6, 2007. When asked to describe his interactions, Detective Alexander said N.W. "wouldn't look at me." The two girls were later interviewed by Emily Williams at the Children's Advocacy Center, which Detective Alexander monitored via closed-circuit television. He also met with N.W.'s mother at the hospital. The detective testified Defendant called the mother twice while at the hospital and that he listened to two voicemails left by him, one in which he asked her to call him immediately, and another in which he said he had "explaining to do." The detective later arranged for N.W.'s mother to make a controlled phone call to Defendant, which in turn resulted in a face-to-face meeting between the two that was recorded. The detective identified Defendant in court and testified that he obtained the victims' medical records. On cross-examination, Detective Alexander acknowledged that two individuals spoke to the victims before he did.

Next, the State called Ms. Kim Burt Roland, who was working as a triage nurse at the hospital on October 13, 2007. She explained that her job was to document the chief complaint of those entering the emergency room (hereafter "E.R."). M.R. told Ms. Roland she was raped by a twenty-five year-old man named "Mike" and that he licked her breasts and stomach and put her legs around him and started humping. Ms. Roland explained the procedures the staff follows when an individual enters the E.R. alleging sexual assault, which includes completing a SANE exam within seventy-two hours to collect physical evidence.[2] The State then entered M.R.'s October 13, 2007, medical record into evidence, which indicated she stated the incident occurred "last week" and "Michael Guillory" touched her under the clothes on her chest area and behind, and they would both be in big trouble if she told anyone, that she said "No" several times,

---

[2] A "SANE" exam is a sexual assault examination performed by a nurse with specialized training to aid victims of sexual violence.

he took out his "thing" (meaning "penis") and asked her if she wanted to know how to play with it, and he showed her his condoms.

N.W.'s chief complaint was that she, too, was raped by her mother's friend and he was wearing a condom when it occurred. N.W.'s medical records from October 13, 2007, were also entered into evidence. The record indicates that the rape occurred "one week ago." It was explained that no SANE exam was completed because the alleged assault occurred more than seventy-two hours prior to N.W.'s visit at the E.R. On cross-examination, defense counsel highlighted that because of the delay in reporting, there was no physical evidence of a sexual assault as to either victim.

The State's third witness was Ms. Emily Williams, who interviewed N.W. and M.R. at the Children's Advocacy Center (hereafter "CAC"). The interviews were recorded and entered into evidence.

N.W.'s interview was played for the jury first. The interview was conducted on October 16, 2007, and N.W. began by saying she was "molested." She explained that she went with her mother and "Mike" to get M.R. to bring her back to her house for the night. Her mother first fell asleep on the couch, but then her mother went to sleep in her bedroom. Shortly after that, "Mike" picked N.W. up off the couch and brought her into her bedroom. She did not wake up until he put her on the bed. She says the first thing she remembers is seeing "Mike" molesting her. He was taking his clothes off and put something on his "private." She explained that she was scared and froze at that moment, and she "guessed" that he spread her legs. Her shorts were loose, and he moved her underwear to the side and held them to the side to "molest" her. She described how she was laying on her back as this occurred, eventually saying that "he put his thing in me." She alternatively described it as him putting his "private" in her "middle spot." Throughout, he asked her "does that feel good?" and "does that hurt?" She said he

4

also put his hand on her chest but did not remember if it was under or over her shirt. After some prodding, she said it was over the shirt. He did not make her do anything to him. After the encounter, she went back to the couch, laid on M.R. and cried. She said she could not remember if M.R. was asleep or not at the time and that her mother was in her room. She did not see if he did anything to M.R., but M.R. told N.W. that he "molested" her. N.W. said that M.R. told her that he put his thing inside of M.R. too. She said she was scared that he would hurt her and that a man named Andrew had hurt her before. Andrew had tried to remove her clothes, but she kicked him off. She told M.R. first about what happened, then her mother's friend, Alicia. Ms. Williams showed her two drawings. The first was a female, on which she circled the chest and "middle spot." She said he went inside her "middle spot." The second was a male, on which she circled the hand and penis. She also placed an "X" over the penis to signify where he put the "thing" on his penis, presumably meaning a condom. She did not know what happened to the condom, nor did she see anything come out of his penis. Finally, she explained how her mother confronted him in her presence.

Defense counsel cross-examined Ms. Williams subsequent to the jury's viewing of N.W.'s interview but before its viewing of M.R.'s interview. Ms. Williams acknowledged that N.W. spoke with an Alicia Daigle before her interview regarding the allegations against Defendant and that Ms. Daigle may have used techniques that Ms. Williams would not have used in her profession, such as possibly asking leading questions to obtain information from N.W. Ms. Williams also acknowledged that, aside from Ms. Daigle, N.W. had also spoken with M.R. and her mother about what had occurred prior to her visit to the CAC. M.R. had apparently told N.W. that Defendant "put his thing in her [M.R.]." She also agreed with defense counsel that N.W. had said she was "halfway asleep" right *after* the Defendant forcibly raped her and that she needed help from the

5

Defendant walking from one room to another. Finally, defense counsel highlighted that N.W. had revealed an allegation of sexual abuse within the preceding year by her mother's former boyfriend, Andrew.

After cross-examination of Ms. Williams on her interview with N.W., the State redirected her, playing M.R.'s interview for the jury. M.R. began by stating her age, thirteen years old, and date of birth, July 31, 1995. She explained how she had known N.W. for about three years and that N.W. was her favorite friend. N.W.'s mother picked her up late on a Friday night. The next day, there was a twenty-five year old man at N.W.'s house that touched them, although she did not see what happened to N.W. She said the man "French kissed" her and touched her. He took out his "private spot" and asked if she wanted to know how to play with it. He took her by the hand and said if she told anyone about what happened that they would both be in trouble. He took out condoms and showed them to her. She said that N.W. told her that he put his thing in N.W. When asked when this occurred, she said it was a Friday night two weeks prior but that he did not do anything to her until the next day. She originally said she left on Monday but then quickly corrected herself and said she left Saturday. She said N.W.'s grandmother told her what happened to N.W. She said that she went into N.W.'s room, where her phone was charging, and that he followed her in the room and that is when he took out his "thing" and kissed her and touched her under her bra. She did clarify that "thing" meant "penis." He also put his tongue on her chest and in her mouth in the hallway of the house. Ms. Williams specified with her that there were three instances in all, one in the hallway where he put his tongue on her chest, another in the hallway where he put his tongue in her mouth, both of which occurred after he pulled his penis out for her in N.W.'s bedroom. She said that the bedroom incident occurred early the next morning, around five or six a.m., but she also said that N.W.'s mom was at work when these incidents occurred. She then said there was

also an incident in the "front room" where he kissed her. At one point, M.R. and N.W. were discussing what he was doing to them, and he walked into the room where they were talking and pulled their pants down. M.R. said that N.W. told her that he put his "thing" in her two times, kissed her, grabbed her chest, and grabbed her behind. She said that in the hallway, he put M.R.'s legs around him and "bounced" her. Ms. Williams then showed M.R. the drawings of a male and female. She circled the "boobs" on the female, saying he licked and touched them, circled the hands, and circled the vagina, calling it the "front of the butt" and saying he put his hands on it over her clothes. On the male drawing, she circled the mouth and hands, saying he used them on her "boobs," and used his hand on her vagina. Additionally, she circled the chest saying he made her touch it, and she circled the penis. She explained that she ultimately confided in her mother because she was worried about N.W. She said he also called her twice after and that one time, her father spoke to him on the phone.

On cross-examination, defense counsel highlighted how M.R., like N.W., never mentioned having gone to a carnival on the Friday evening just prior to when the abuse began. Ms. Williams agreed that M.R. did not mention Defendant putting his "thing" inside her, although N.W. told Ms. Williams otherwise. Defense counsel attacked the variation in M.R.'s recounting of what occurred, specifically how she stated that she left N.W.'s house on Monday, then changed it to Saturday; how M.R. told her that N.W.'s grandmother told M.R. about the Defendant picking N.W. up off the couch Friday night and bringing her into a back room (which was later contradicted at trial during M.R.'s testimony); how Defendant first abused her around five a.m. on Saturday morning, then changed it to around six a.m., but that N.W.'s mom woke them up first while Defendant was still sleeping on Saturday morning; and how Defendant had slapped N.W. on the arm at one point, causing a bruise, which N.W. never mentioned. On redirect, Ms.

7

Williams explained that a child victim will not disclose in great detail every single incident that may have happened over a course of days.

Ms. Alicia Guthridge (formerly Alicia Daigle), a friend of N.W.'s mother, took the stand next. She explained that the mother asked her to speak to N.W. concerning "sexual contact" between N.W. and Defendant. Ms. Guthridge testified that N.W. told her Defendant "did it with her and that he used a condom." She clarified that N.W. told her "he had sex with her." Ms. Guthridge did struggle to remember specific details, because the conversation occurred "a while back," so she referred to her written statement, in which she wrote that N.W. used the word "thing." On cross-examination, defense counsel pointed out Ms. Guthridge had no specialized training or experience in talking to children about sexual abuse. Referring to Ms. Guthridge's statement, defense counsel pointed out that Ms. Guthridge asked N.W., in leading fashion, "did that guy touch you?" and "did he put his thing in you?" On redirect, the prosecutor had Ms. Guthridge read her statement verbatim and attempted to enter the statement over Defendant's objection, which the court took "under advisement."[3]

M.R.'s mother, was the State's next witness. She explained that when M.R. first told her about what Defendant did the following Monday after school, she was "bawling." She then proceeded to explain, with no objection from Defendant, what M.R. told her, that there was someone who messed with and touched her and that M.R. thought N.W. was being hurt too. She recounted how M.R. told her that Defendant touched her chest, put his tongue in her throat, and showed her his "thing." "At some point" later on, the two mothers decided to bring N.W. and M.R. to the hospital. M.R.'s mother acknowledged on cross-examination that she

---

[3]The court never made a final ruling. However, the issue was not raised by Defendant on appeal, rendering it moot.

and N.W.'s mother were in contact prior to going to the hospital, as were her daughter and N.W.

M.R. was the State's sixth witness. Due to the length of time since the incident occurred, M.R. acknowledged she did not "remember everything." She began by identifying Defendant in court and explained how she went to N.W.'s house after attending a carnival in Jennings. According to her testimony, after N.W.'s mother went to work the next day, "that's when everything started to happen." She explained that she went to check her phone which was charging in N.W.'s room and Defendant followed her in, took out his "private," and asked her if she wanted to learn how to play with it. She was twelve years old at the time. She also testified while at N.W.'s house, Defendant showed her condoms, picked her up in the hallway and put her legs around him and began "bouncing" her, that he put his hands on her chest and "all over" her, and that he put his tongue down her throat. Defendant also grabbed her hand and told her not to tell anyone about what happened. Defense counsel's cross-examination elicited the fact that what M.R. referred to as Defendant's "private" was indeed his penis. She conceded that she never did speak with N.W.'s grandmother about what happened, in contradiction of what she said during the CAC interview. She testified that N.W.'s mother was home at one point when both she and Defendant were alone in N.W.'s room. She stated Defendant told her "Hey, if [N.W.]'s mom asks anything, I was in the bathroom, you were in the bedroom." She explained that she did not tell N.W.'s mother about anything that was occurring because she did not know what Defendant was capable of. She said she began feeling unsafe but did not text her own mother because she was concerned about being at the house "while everything was going on," which presumably referred to potential reaction by Defendant to any accusations she may have made. She could not recall having seen the Defendant ever strike N.W., but she did remember seeing a bruise on N.W.'s arm

9

without specifying how N.W. became bruised. Finally, she conceded that she could not remember what time on Saturday the Defendant exposed himself to her. On redirect, she acknowledged she made a "mistake" when she told Ms. Williams that she had spoken to N.W.'s grandmother about the Defendant picking N.W. up off the couch and bringing her into a back room. She recalled that she had in fact received that information when both she and N.W. were in N.W.'s room discussing what Defendant was doing to them. At that time, Defendant walked in and pulled both girls' pants down.

The State then called N.W. She, too, began by identifying Defendant in court. She testified that M.R. came to stay at her home after the carnival in Jennings, but also admitted that she did not remember everything. She said that she did remember being asleep on the couch with M.R. and that the Defendant picked her up and brought her to her room, where he laid her down, pulled her clothes to the side, and "raped" her. By "raped," she meant that Defendant "stuck his thing inside of [her]." As the prosecutor attempted to get more detail from N.W. about what exactly occurred, N.W. used the words "rape" and "molest" interchangeably, saying that she "get[s] them confused every now and then" but that he did put his "thing" in her. Contrary to M.R.'s testimony, she stated that the Defendant "always" had them in "a different room" so that neither ever saw what he did to the other. On cross-examination, defense counsel brought up an individual named Landon, who N.W. described as a neighbor that she did not like. She did not remember Landon coming over on the Saturday in question. She said that she, M.R., and her mother were asleep on the couches when Defendant picked her up and brought her to her room and that she was half asleep. She did not call for help because she "froze." She could not remember if M.R. told her whether or not Defendant put his "thing" in M.R. but that she might have "mis-heard" [sic] her. She said she "thinks" the Defendant hit her arm at some point and that it

10

caused a bruise to her arm. She testified she did not recall any specific threats of harm but did recall Defendant "telling [her] to tell [M.R.] to be quiet or he would get [them] in trouble." Defense counsel also pressed N.W. on the details of the Defendant's penis, but she could only remember seeing it and the Defendant putting a condom on. She could not remember if, afterward, her mother was asleep or if she had already left for work. On redirect, the prosecutor established that N.W.'s date of birth was March 6, 1994, making her thirteen years old at the time of the offense, that Defendant put his penis in her, and that all of the alleged misconduct occurred at N.W.'s her home.

The State next called Detective Phil Robertson of the Lake Charles Police Department, who assisted the sex crimes division of the sheriff's department in recording a conversation between N.W.'s mother and Defendant on October 15, 2007. The State recalled Detective Jason Alexander of the Calcasieu Parish Sheriff's Department to enter the recording into evidence. After a discussion outside the presence of the jury regarding the content of the recording, the State called N.W.'s mother to the stand.

N.W.'s mother testified she lived in Gillis, Calcasieu Parish, prior to moving to her current residence in Jennings, Louisiana. She brought her daughter, N.W., to the carnival with M.R. and Defendant, and afterword the four went back to her home in Gillis. She explained how the girls were to sleep on the couch "closer to [her] room," and that Defendant would sleep in [N.W.]'s room "at the end of the trailer." She recalled seeing Defendant come out of either the bathroom or N.W.'s room "at some point that night" and that "[M.R.] was in the bedroom." She explained that she did not suspect that Defendant was doing anything improper until M.R. called N.W. and asked N.W. whether she told her mom about what happened. She took the phone from N.W. and spoke to M.R. herself, who explained that Defendant "touched" her and "raped" N.W. Upon learning of the

allegations, N.W.'s mother said she asked N.W., who would not tell her anything. She then confronted Defendant while with N.W., and Defendant denied the allegations. She then enlisted the help of her friend Alicia to talk to N.W. about what had happened, and after N.W. talked to her, she decided to bring N.W. to the hospital. She explained that, with the assistance of law enforcement, she arranged to meet with Defendant and record their conversation. The State then published the recording for the jury. A review of the roughly eighty-minute recording reveals mostly a one-sided conversation during which Defendant discusses many irrelevant subjects, such as guns and his ability to lift really heavy weights. In any event, Defendant stated he was "hurt" by the accusations but described himself as "stupid" too. He did admit he touched N.W.'s breasts, said N.W. tried cuddling with him, and both girls flashed their breasts at him. He said the allegations made by M.R. were a "joke" but he felt bad about the situation with N.W., and that he "really f_ _ _ ed up." He told N.W.'s mother she would be at risk of losing N.W. because of the situation and incorrectly explained to her the "law" on child molestation. For example, he said squeezing a child's muscle or picking a child up was child molestation.

On cross-examination, N.W.'s mother explained that she never had any intimate relationship with Defendant. She testified she began "doing clothes" at some point Friday night after waking up from being asleep on the couch and that she thought M.R. was in the bedroom with Defendant while N.W. slept on the couch. That was also the same time she saw Defendant exiting either the bathroom or the bedroom. She woke the girls early Saturday morning, around six or seven a.m., before she left for work. She thought she woke the Defendant as well before leaving and had not seen him moving around any time before waking him. Regarding the recorded conversation, she explained that she told Defendant the girls were telling her different stories so that he would not "catch on to what [she]

12

was doing." She testified that, as far as she knew, N.W.'s allegations against Andrew were never investigated further. She did, however, admit that she tried to stab Andrew when he was "beating up" on her. Defense counsel also highlighted Defendant's definition of molestation, as Defendant explained it on the recording, to mean something as simple as squeezing a muscle or picking the child up. N.W.'s mother also acknowledged that Defendant would "horseplay" with N.W. and that she did not find it to be inappropriate. Defense counsel also discussed a supposed admission by N.W.'s mother to Lovisa LeBert that she did not believe the incident with Defendant occurred, but N.W.'s mother denied ever saying that. She also denied ever contacting Defendant after the incident or spending any time with him.

Ashley Kibler testified next, explaining that she had met Defendant at a concert in 2007 when she was fifteen years old. Soon after meeting him, she saw him again after her friend "Danny" picked her up for a party and dropped the two of them off at a camper in Lake Charles while he went to the store. "Danny" never came back, and as they waited for him at the camper, Defendant went inside and talked to someone. When Defendant came back out, he began talking to her, then rubbing her, and pushing her against a car. He put one hand over her mouth, lifted her leg, moved her underwear to the side and put his penis inside of her. She said that after this happened, sometime between twelve and two a.m., Defendant went to "check on something" and never came back. She testified she did not report the incident immediately, but waited until two weeks later. She identified Defendant in court, and said she received a letter from him threatening her if she pursued the charges. She also discussed threats made by people other than Defendant, with no objection from defense counsel. No limiting instruction was requested nor given at the time of the witness's testimony. On cross-examination, she told defense counsel that her friend Danny's last name was "Hess." She acknowledged there

13

were other homes nearby the camper, within earshot, but she did not scream because she was scared. She responded "Yes" to counsel's question "Are you sure [the Defendant] used his penis?" However, she did not see it because it was dark.

The State next called first assistant district attorney Cynthia Killingsworth, of the Calcasieu District Attorney's Office. She identified Defendant, testified that she had prosecuted him for oral sexual battery in 2002. No limiting instruction was requested nor given at the time of the witness's testimony. After defense counsel cross-examined the witness regarding Defendant's age at the time of the conviction, to which she answered he was sixteen years old, the State rested its case.

The defense's case began with Daniel Hess. He testified that he knew Ashley Kibler from high school but that he did not know her well or ever spend time with her. He did not recall ever giving her a ride in his car or dropping her off anywhere, nor did he know Defendant. On cross-examination, the State attempted to elicit that because the witness could not answer defense counsel's questions "for sure," it was at least "possible" that he had done those things to which Ashley Kibler testified. The witness simply answered that he did not know but maintained that he did not believe he ever gave Ashley Kibler a ride.

Defendant next called Lovisa LeBert, whose son had been incarcerated with Defendant. She had also lived with N.W.'s mother, after Andrew had asked her if N.W.'s mother could move in with her. Several years had passed, yet Ms. LeBert testified that about a month before trial, N.W.'s mother told her through a Facebook conversation that "[s]he didn't know if it really happened because [N.W.] didn't go to her for a whole week." Ms. LeBert also stated that N.W.'s mother told her that M.R. said "nothing happened" between her and the Defendant. Cross-examination consisted of the prosecutor revealing that she had attempted to discuss the case with Ms. LeBert before trial, but was unsuceesful.

14

Defendant's next witness was Marion Rougeau, who described herself as a friend of Defendant for the past six or seven years. She testified she would have been with Defendant almost every day around the time of his arrest, including October 15-17, during which time N.W.'s mother called Defendant. Nothing more was drawn from Ms. Rougeau. The prosecutor again highlighted the fact that she tried to speak with this witness prior to trial, to no avail.

Marcellette Tweed, Defendant's mother, took the stand next. She testified that N.W.'s mother would come to her house to visit Defendant and would give him rides just weeks before his arrest. The prosecutor on cross-examination asked the witness if she loved her son, and she answered that she did.

Defendant then called Detective Michael Primeaux, who investigated the allegations made by Ashley Kibler against the Defendant, back in August of 2007. The detective did not explain what, if anything, resulted from Ashley Kibler's statement to the police. He did confirm, however, that Ashley Kibler was a runaway juvenile at the time and that there were other houses in the vicinity of the alleged offense. On cross-examination, the Detective stated that he was able to determine that Defendant was living somewhere on or near Thornton Street, where the alleged offense occurred.

The defense recalled N.W. She testified she told an officer that she had gotten up off the couch on the Friday night after the carnival to get a blanket, which is when the assault occurred. At the time of her testimony at trial, however, all she could remember is Defendant picking her up and bringing her to the room. She could not remember going to get a blanket. She stated that she could only remember one incident but that "[i]t may have happened twice," but she could not be sure.

Defendant's next witness was Lieutenant Gerald Allen. He testified that he worked at the Calcasieu Parish Sheriff's Office in 2007 as a patrol deputy. He

spoke to N.W., who provided a statement saying she went to her bedroom from the living room to get a blanket and fell on the bed, not that she was carried to her room by Defendant.

The Defendant's last witness was his sister, Ms. Pansy Guillory. She testified that Defendant had a tattoo on his penis. She had never "seen it" but knew about it because "anybody" in the family or close to the Defendant knew, apparently. Defense counsel subsequently admitted Defendant's jail medical screen, which indicated that he did indeed have a tattoo on his penis, obviating any need to have his sister testify about the unique features of his penis. The State had knowledge that Ms. Guillory spoke with Defendant the night before her testimony, and on cross-examination elicited that she told Defendant during the conversation that she was going to "work her magic" in court, using her "power of persuasion." Upon completion of Ms. Guillory's testimony, the Defense rested its case.

## ANALYSIS

As set forth earlier, Defendant alleged as his sole assignment of error that evidence adduced at trial was insufficient to support his conviction. The analysis for an insufficiency of evidence claim is well-settled:

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979); *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See State ex rel. Graffagnino*, 436 So.2d 559 (*citing State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371.

16

Forcible rape is defined as follows:

[R]ape committed when the anal, oral, or vaginal sexual intercourse is deemed to be without the lawful consent of the victim because it is committed . . . [w]hen the victim is prevented from resisting the act by force or threats of physical violence under circumstances where the victim reasonably believes that such resistance would not prevent the rape.

La.R.S. 14:42.1.

Indecent behavior with a juvenile is defined as follows:

[T]he commission of any of the following acts with the intention of arousing or gratifying the sexual desires of either person: (1) Any lewd or lascivious act upon the person or in the presence of any child under the age of seventeen, where there is an age difference of greater than two years between the two persons. Lack of knowledge of the child's age shall not be a defense[.]

La.R.S. 14:81.

Defendant argues that "significant inconsistencies and contradictions" in the victims' own statements and each other's statements, which provide the only direct evidence against Defendant, render his convictions invalid, as "no rational juror could have found that the State proved, beyond a reasonable doubt, that the Defendant committed the charged offenses."

A review establishes the evidence adduced at trial presented some credibility issues. The jury was required to base its decision on the testimony of two victims who were only twelve and thirteen years old at the time of the offenses, six years after the abuse occurred. There was no physical evidence to corroborate their claims, and the testimony varied throughout the trial concerning what exactly occurred and when. However, we note under the reasoning of *Kennerson*, credibility is a matter for the fact-finder. "It is well-settled that a jury is free to believe some, none, or all of any witness's testimony." *State v. Perkins*, 11-955, p. 10 (La.App. 3 Cir. 3/7/12), 85 So.3d 810, 817. As to the essential elements of the crimes charged, we find the State did indeed satisfy its burden to prove each beyond a reasonable doubt.

17

In reaching this conclusion, we have relied primarily on the trial testimony of the victims. Defendant himself conceded that "such testimony [i.e., testimony of a victim/victims alone] is usually sufficient to convict." Defendant also conceded that the victims "generally maintained the 'what' of the allegations" but "varied widely on the 'when', 'where' and 'how' of the events." Aside from standard recitations of the law on this particular point, Defendant failed to cite any fact-specific jurisprudence applicable to this case. To the contrary, the victims did maintain the "what" of their allegations, which established the essential elements of the crimes. N.W. testified Defendant put his penis in her vagina under circumstances indicating that it was by force and without consent. M.R. testified Defendant used his mouth on her breasts when she was less than seventeen years old. Based on the testimony of witness Killingsworth, Defendant's date of birth in 1982 established he was two years older than M.R. in 2007.

Although Defendant contends much of the testimony provided by the other witnesses, taken alone, is underwhelming; we note, in conjunction with the testimony of the victims, it becomes more compelling. For example, the nurse at the E.R. corroborated what the girls testified to; Ms. Reed testified that M.R. was "bawling" when M.R. finally told her about what happened; and Defendant himself admitted that he touched N.W.'s breasts. As to the latter point, the jury logically could have considered that Defendant was merely minimizing his true conduct. As to all the evidence presented, the jury credited what it deemed fit and discredited the rest. This court is not privy to the jury's deliberations and must accept the credibility determinations of the jury within the limits of *Jackson*. Under that mandate, we find, after viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.

18

## DECREE

For the foregoing reasons, we affirm Defendant's convictions.

**AFFIRMED.**