STATE OF LOUISIANA

COURT OF APPEAL, THIRD CIRCUIT

19-536

STATE OF LOUISIANA

VERSUS

BRACH ANTHONY ISTRE

**********

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. CR-161696
HONORABLE MARILYN CARR CASTLE, DISTRICT JUDGE

**********

**JONATHAN W. PERRY**
**JUDGE**

**********

Court composed of Sylvia R. Cooks, Billy Howard Ezell, and Jonathan W. Perry, Judges.

**AFFIRMED.**

**Chad M. Ikerd**
**Louisiana Appellate Project**
**Post Office Box 2125**
**Lafayette, Louisiana  70502**
**(225) 806-2930**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **Brach Anthony Istre**


**Honorable Keith Stutes**
**District Attorney, Fifteenth Judicial District**
**Roger P. Hamilton, Jr.**
**Assistant District Attorney**
**Post Office Box 3306**
**Lafayette, Louisiana  70502**
**(337) 232-5170**
**COUNSEL FOR APPELLEE:**
    **State of Louisiana**

**PERRY, Judge.**

Defendant, Brach Anthony Istre, was charged with and unanimously found guilty by a six-person jury of the second-degree battery of Terri Anderson (Ms. Anderson). He was sentenced to five years at hard labor. Defendant now appeals. For the reasons that follow, the verdict of the trial court is affirmed.

## PROCEDURAL BACKGROUND

On May 22, 2017, Defendant, Brach Anthony Istre, was charged with second-degree battery and theft of a firearm, in violation of La.R.S. 14:34.1 and La.R.S. 14:67.15, respectively. On July 7, 2017, an amended bill of information was filed, adding charges of unauthorized use of an access card and violation of a protective order, in violation of La.R.S. 14:67.3[1] and La.R.S. 14:79, respectively.

On February 25, 2019, before jury selection, the second-degree battery charge was severed for trial purposes. Trial began on February 26, 2019, and the following day a jury of six unanimously found Defendant guilty of the second-degree battery charge.

On June 6, 2019, Defendant filed a Motion for New Trial as well as a Motion for Post-Verdict Judgment of Acquittal. The trial court denied the Motion for Post-Verdict Judgment of Acquittal on June 10, 2019, declaring, "There was ample evidence to support the jury's verdict." On June 13, 2019, the trial court denied the Motion for a New Trial without comment. The same day, Defendant was sentenced to five years at hard labor, consecutive to other sentences which he received that day,[2] with a recommendation that Defendant receive treatment for substance abuse and anger management. A Motion to Reconsider Sentence was filed on June 17,

---

[1] Repealed by 2017 La. Acts No. 281, § 3, effective August 1, 2017.

[2] Defendant was sentenced to four years at hard labor for the offense of simple battery in docket number 157881. Defendant was sentenced to two years at hard labor for the offense of simple burglary of an auto in docket number 161244. These sentences run concurrently.

2019, wherein Defendant asked for an "at least partially, suspended sentence." On June 19, 2019, the trial court neither granted nor denied the motion, instead stating, "The Court will leave open the time to reconsider sentence and will only entertain such a motion upon successful completion of D.O.C. programs of drug treatment, anger management and job training."

Defendant presents two assignments of error in this appeal. First, the evidence was insufficient to prove Defendant did not act in self-defense. Secondly, the trial court erred in admitting the evidence of an existing protective order.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find there are no errors patent.

## DISCUSSION OF THE EVIDENCE

At trial, the first witness to testify was Officer Dylan Smith of the Lafayette Police Department. Officer Smith testified he was dispatched to the victim's address on March 27, 2017, in response to a domestic disturbance in progress. He stated that upon arrival, he observed minor swelling of the victim's face and the victim, Ms. Anderson, complained of shoulder pain for which she subsequently had surgery. Officer Smith noted Defendant had fled before authorities arrived, noting Ms. Anderson was the only person present. He stated he did not see any injuries to Ms. Anderson other than her face and shoulder.

The State then called Detective Norman Maldonado of the Lafayette Police Department. Detective Maldonado stated he spoke with the victim on April 13, 2017 and observed an approximately eight-inch scar on her arm as a result of surgery to fix either a broken or fractured humerus. Detective Maldonado acknowledged he did not photograph the scar.

2

The State then called the victim as its final witness. Ms. Anderson testified she went home during lunch, which was unusual for her, and found her daughter, Katie Anderson (Katie), had spent the night. Defendant, Katie's boyfriend, was also there. Ms. Anderson testified she immediately told Defendant to get out of her house when she saw him and stated he grabbed her wrist, twisted it to take her phone away, and then threw her phone. Ms. Anderson insisted she kept telling both Katie and Defendant to leave and that Defendant eventually grabbed her by the head and pulled her back while she was walking past him. She then went to her room and retrieved an unloaded gun, hoping Defendant would leave if she pointed it at him. Ms. Anderson testified that when Defendant saw her with the gun he was standing in the door of Katie's room. Defendant took the gun from her, found it unloaded, and then began "screaming obscenities." Ms. Anderson gave the following description of how her arm was broken:

> And, then, he threw me and dragged me into the living room, threw me down on my chest, and just banged me. And he wouldn't get off of me. And I was screaming. I was even screaming for my daughter to help me.
>
> And he - - he took my arms. And you know how - - that game you used to play when you were a kid, you know, like uncle? He - - Like, he just pulled back, back, and back. And he pulled this one. And this is the one that he broke (indicating). I heard it break. It's the humerus bone. It's the biggest bone in your body. And, then, he just kept on pulling it. And he wouldn't stop.

Ms. Anderson then recounted crawling to her front door, opening it, and screaming for help. She testified at that point Defendant took off in one direction while Katie got on her bike and rode the opposite way. Ms. Anderson had surgery to repair the broken bone in her right arm. She also acknowledged that she had received a protective order against Defendant prior to this incident, stating that was why she did not want him anywhere near her.

3

In addition to the broken humerus, Ms. Anderson testified the tendons across her shoulder were also torn by Defendant's actions. Noting she is right-handed, Ms. Anderson stated she will never have full use of her right arm due to the damage inflicted on her by Defendant.

Ms. Anderson explained Katie was not living with her, but she allowed her daughter to take showers and eat at her home when needed. She remembered speaking to a law enforcement officer at her home before being transported to the hospital. She could not recall telling the officer that Katie was only at the house to shower. Ms. Anderson testified her daughter and grandson spent the previous night at her house but was adamant Defendant did not because "he's not welcome at [her] home."

Ms. Anderson testified that when she went to her closet to get her unloaded gun, Defendant was "putting stuff in a book sack." She approached Defendant with the gun, at which point he began screaming obscenities at her. Ms. Anderson acknowledged pointing the gun at Defendant while standing very close to him. She denied saying anything other than "get out," and testified that as soon as Defendant saw the gun he took it from her, opened it, and saw it was unloaded, all before throwing her on the ground and breaking her arm.

Ms. Anderson stated that after taking the gun from her, Defendant became "extremely angry" and slammed her face down on the floor. She did not recall telling anyone that Defendant had put her on the floor on her side or that he took the gun after she was on the ground. Ms. Anderson spoke about her neighbors coming over after her dogs got out the home and noted she was sedated once the ambulance arrived and her memory was spotty. At that point, the State rested its case.

The defense called Katie as a witness, who acknowledged Defendant is the father of her son. She stated they were not together at the time of trial. Katie testified

4

she and Defendant had been staying at Ms. Anderson's home Saturday and Sunday to visit. She stated she and Defendant got their son, Ethan, ready for school while Ms. Anderson was getting ready for work. Katie testified Defendant put Ethan into the car seat in Ms. Anderson's automobile when Ms. Anderson's dogs got out. According to Katie, she and Defendant were supposed to bring the dogs inside but instead went to sleep and left them outside.

Katie testified that she woke up when Ms. Anderson entered the home screaming about Katie not letting the dogs inside and noted she had twenty-seven missed calls. Katie testified Ms. Anderson entered the house and immediately went to the bedroom where Katie and Defendant were sleeping and started screaming. Katie started arguing with Ms. Anderson, who told her to leave, so Katie told Defendant to grab their stuff as she went to the bathroom. Stating she knew she had a warrant for her arrest, Katie testified she took Ms. Anderson's phone to prevent her from calling law enforcement before Katie and Defendant could leave.

Stating her mother was continually yelling at Defendant while he was packing bags to leave, Katie testified she heard her mother tell him "I'm going to f'ing shoot you." She testified Ms. Anderson walked past the bathroom and came back with a gun in her hand. When asked what she saw of the scuffle, Katie testified:

> That's, you know, kind of a fog. I'm not sure. I don't remember, from the bedroom into the living room, the whole scuffle.
>
> But, once they're in the living room, Brach had had her on the ground, almost, you know, facedown. And it was like a police [sic] would be arresting you. He had, you know, pulled her arms back.
>
> And that's - - You know, he grabbed the gun. And I do - - You know, she was screaming a lot of stuff. And, the whole time, I do remember Brach saying, stop, Terri, I don't want to hurt you, stop, stop, stop. You know, just - - And she was just - - you know, adrenalin.

Katie testified that once Defendant had taken the gun from Ms. Anderson and thrown it away, she locked the gun in her room, Defendant let go of Ms. Anderson,

and Katie and Defendant both grabbed their bags and ran. She described the altercation between Ms. Anderson and Defendant as "a struggle," claiming Defendant "was definitely just trying to get the gun from [Ms. Anderson]."

Katie acknowledged that she and her mother have had a strained relationship and acknowledged knowing that her mother had a protective order against Defendant at the time of the incident. She also stated that she was "pissed off at [Defendant]." The defense rested following Katie's testimony.

## SUFFICIENCY OF THE EVIDENCE

In his first assignment of error, Defendant contends "[t]he State failed to sufficiently prove that [he] did not act in self-defense." Defendant asserts Katie's testimony supports his claim of self-defense. Defendant claims he was simply trying to leave when the crazed victim pulled a gun on him, and he broke her arm in an attempt to disarm her. This court has previously stated:

> To convict a person of second-degree battery, the State must prove the following elements beyond a reasonable doubt: (1) the intentional use of force or violence upon the person of another; (2) without the consent of the victim; and, (3) when the offender has specific intent to inflict serious bodily injury.

*State v. Robinson*, 549 So.2d 1282, 1284 (La.App. 3 Cir. 1989).

Defendant contests only the third element, arguing the State failed to prove specific intent because it failed to disprove his claim of self-defense. Consequently, we will only address that element of the offense.

The State contends Defendant cannot claim self-defense under the aggressor doctrine of La.R.S. 14:21: "A person who is the aggressor or who brings on a difficulty cannot claim the right of self-defense unless he withdraws from the conflict in good faith and in such a manner that his adversary knows or should know that he desires to withdraw and discontinue the conflict." The State's argument is based upon the victim having a protective order that prohibited Defendant from

6

being near her or her home at the time of the incident.  We find this assignment of error lacks merit regardless of the applicability of the aggressor doctrine.

The analysis for insufficient-evidence claims is well settled:

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.  *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979), *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981).  It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review.  *See State ex rel. Graffagnino*, 436 So.2d 559 (*citing State v. Richardson*, 425 So.2d 1228 (La.1983)).  In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371.

Defendant's actions would be evaluated under La.R.S. 14:19(A)(1)(a), which permits force or violence "[w]hen committed for the purpose of preventing a forcible offense against the person or a forcible offense or trespass against property in a person's lawful possession, provided that the force or violence used must be reasonable and apparently necessary to prevent such offense."  Assuming the aggressor doctrine does not prohibit Defendant from claiming self-defense, the question becomes whether the force or violence was reasonable and apparently necessary.  The answer to that question is purely based on the issue of witness credibility.

The jury was presented with exactly two versions of the scuffle between Defendant and Ms. Anderson.  Defendant's version, presented by Katie, the victim's daughter and the mother of Defendant's son, was that Defendant broke Ms. Anderson's arm in the process of disarming her after she pointed a gun at him.

7

Ms. Anderson testified Defendant disarmed her, verified the gun was unloaded, then slammed her to the ground and pulled on her arm while pinning her to the ground until her arm broke. Defendant's conviction indicates the jury chose to believe Ms. Anderson rather than Katie. Viewing the evidence in the light most favorable to the State, we must reflect on Ms. Anderson's version of the events. We do not view slamming an unarmed woman to the ground and cranking on her arm until it breaks either reasonable or apparently necessary.

As noted in *Kennerson*, 695 So.2d 1367, it is the factfinder's duty to weigh the credibility of witnesses. Given that Defendant's conviction appears based entirely upon the jury's belief that Ms. Anderson was more credible than her daughter, we find Defendant's first assignment of error meritless.

## ADMISSIBILITY OF EVIDENCE

In his second assignment of error, Defendant contends the trial court erred in allowing the introduction of the protective order the victim had against Defendant at the time of the attack. The record reflects when the State offered the protective order, the trial court overruled Defendant's objection, stating, "it's not a criminal order." Defendant argues the trial court erred in ruling the protective order was not subject to a hearing to determine admissibility, in accordance with La.Code Evid. art. 404(B) and *State v. Prieur*, 277 So.2d 126 (La.1973).

We agree with Defendant that the trial court's ruling that the protective order was per se admissible because "it's not a criminal order" was incorrect. The first circuit has previously found that "while the protective order is not, itself, necessarily 'other crimes' evidence, such a legal document is indicative of wrongs or acts perpetrated by the person against whom the order is issued, so an analysis under La. Code Evid. art. 404(B) is proper." *State v. Kitchen*, 17-362, pp. 12-13

8

(La.App. 1 Cir. 9/15/17), 231 So.3d 849, 860, *writ denied*, 17-1983 (La. 11/14/18), 256 So.3d 281 (citations omitted).

However, we note that even in *Kitchen*, 231 So.3d at 862, the court evaluated whether the protective order would have been admissible without the erroneous ruling that the order was not indicative of other crimes:

> While the trial court found the protective order not to be evidence of other crimes or bad acts, this finding does not undermine the conclusion that the mention of a protective order would have been admissible under Article 404 and the [*State v.*] *Taylor*[, 16-1124 (La. 12/1/16), 217 So.3d 283] procedure.
>
> The victim's mention of an outstanding protective order is itself evidence sufficient to support a finding that defendant committed another bad act. Defendant disputed his identity as the vehicle's driver, so the protective order was probative of motive, intent, identity, and absence of mistake or accident. Finally, because the evidence concerning the protective order was limited to its existence, and not inclusive of the underlying facts leading to it, its probative value outweighed any prejudice. Therefore, the victim's statement concerning the protective order was properly admitted into evidence.

There is no question the victim did in fact have a protective order against Defendant, prior to the incident in question. Additionally, the existence of the protective order is highly relevant to the Defendant's self-defense claim. Contrary to Defendant's claim the order "did not negate any claim of self-defense," we note the existence of the order severely restricts Defendant's ability to claim self-defense. The self-defense doctrine is enshrined in La.R.S. 14:19, which states:

> A. (1) The use of force or violence upon the person of another is justifiable under either of the following circumstances:
>
> (a) When committed for the purpose of preventing a forcible offense against the person or a forcible offense or trespass against property in a person's lawful possession, provided that the force or violence used must be reasonable and apparently necessary to prevent such offense.
>
> (b)(i) When committed by a person lawfully inside a dwelling, a place of business, or a motor vehicle as defined in R.S. 32:1(40) when the conflict began, against

9

a person who is attempting to make an unlawful entry into the dwelling, place of business, or motor vehicle, or who has made an unlawful entry into the dwelling, place of business, or motor vehicle, and the person using the force or violence reasonably believes that the use of force or violence is necessary to prevent the entry or to compel the intruder to leave the dwelling, place of business, or motor vehicle.

(ii) The provisions of this Paragraph shall not apply when the person using the force or violence is engaged, at the time of the use of force or violence in the acquisition of, the distribution of, or possession of, with intent to distribute a controlled dangerous substance in violation of the provisions of the Uniform Controlled Dangerous Substances Law.

(2) The provisions of Paragraph (1) of this Section shall not apply where the force or violence results in a homicide.

B. For the purposes of this Section, there shall be a presumption that a person lawfully inside a dwelling, place of business, or motor vehicle held a reasonable belief that the use of force or violence was necessary to prevent unlawful entry thereto, or to compel an unlawful intruder to leave the premises or motor vehicle, if both of the following occur:

(1) The person against whom the force or violence was used was in the process of unlawfully and forcibly entering or had unlawfully and forcibly entered the dwelling, place of business, or motor vehicle.

(2) The person who used force or violence knew or had reason to believe that an unlawful and forcible entry was occurring or had occurred.

C. A person who is not engaged in unlawful activity and who is in a place where he or she has a right to be shall have no duty to retreat before using force or violence as provided for in this Section and may stand his or her ground and meet force with force.

D. No finder of fact shall be permitted to consider the possibility of retreat as a factor in determining whether or not the person who used force or violence in defense of his person or property had a reasonable belief that force or violence was reasonable and apparently necessary to prevent a forcible offense or to prevent the unlawful entry.

Under La.Code Evid. art. 404(B)(1), evidence of other crimes, wrongs, or acts

may be admissible "when it relates to conduct that constitutes an integral part of the

act or transaction that is the subject of the present proceeding." Because the protective order prohibited Defendant from being in the victim's home, it is relevant because it restricts the circumstances under which Defendant may claim self-defense. Notably, Defendant could not claim self-defense under La.R.S. 14:19(A)(1)(b), as he was not "lawfully inside" the victim's home; he could not obtain the benefit of the presumption espoused in La.R.S. 14:19(B), again because he was not "lawfully" inside the victim's home; and Defendant could not benefit from La.R.S. 14:19(C) given that he had no "right to be" in the victim's home. Consequently, we find there was no error in admitting the evidence, even if the trial court's stated reasons for said admission may have been erroneous under *Kitchen*, 231 So.3d 849.

## DECREE

For the foregoing reasons, the verdict of the trial court is affirmed.

**AFFIRMED.**