**STATE OF LOUISIANA**
**COURT OF APPEAL, THIRD CIRCUIT**

**23-736**

**STATE OF LOUISIANA**

**VERSUS**

**ARNOLD RAY GOUDEAU**

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
THIRTY-THIRD JUDICIAL DISTRICT COURT
PARISH OF ALLEN, NO. CR-2022-0086
HONORABLE ERROL DAVID DESHOTELS, JR., DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

**GARY J. ORTEGO**
**JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of Shannon J. Gremillion, Charles G. Fitzgerald, and Gary J. Ortego, Judges.

**CONVICTION AFFIRMED; HABITUAL OFFENDER ADJUDICATION AND SENTENCE AFFIRMED.**

**Hon. Joe Green**
**District Attorney**
**John Richardson**
**Assistant District Attorney**
**Thirty-Third Judicial District Court**
**P. O. Box 839**
**Oberlin, LA 70655**
**(337) 639-2641**
**COUNSEL FOR APPELLEE:**
    **State of Louisiana**

**Gregory Cook**
**Attorney at Law**
**1746 Wooddale Blvd.**
**Baton Rouge, LA 70806**
**(225) 924-1117**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **Arnold Ray Goudeau**

**ORTEGO, Judge**.

Defendant, Arnold Ray Godeau, appeals his conviction of carjacking, in violation of La.R.S. 14:64.2, and the trial court's adjudication of him as a fourth habitual offender and resulting sentence of life imprisonment at hard labor, without benefit of probation, parole, or suspension of sentence, as mandated by La.R.S. 15:529.1(A)(4)(c). For the reasons that follow, we affirm Defendant's conviction, habitual offender adjudication and sentence.

### FACTS AND PROCEDURAL HISTORY

On January 27, 2022, Defendant, Arnold Ray Goudeau, was charged by bill of information with one count of carjacking, in violation of La.R.S. 14:64.2, and one count of simple battery, in violation of La.R.S. 14:35. Ms. Faith Marie Sanford was listed as a codefendant in the carjacking charge. An amended bill was subsequently filed, removing Ms. Sanford as codefendant in the case, and changing the simple battery charge against Defendant to a charge of theft of a motor vehicle valued between $1000 and $5000, in violation of La.R.S. 14:67.26(A)(1).

On September 12, 2022, the State dismissed the theft of a motor vehicle charge, and Defendant proceeded to trial solely on the carjacking charge. On September 15, 2022, a unanimous jury found Defendant guilty as charged. On November 29, 2022, the trial court denied defense counsel's motions for post-verdict judgment of acquittal and for a new trial, both based on claims the evidence was insufficient and the trial court's refusal to include a special jury instruction sought by defense counsel. Defendant was also arraigned on a habitual offender bill of information on that date.

On January 6, 2023, both judges of the Thirty-Third Judicial District Court recused themselves from the case and requested that the Louisiana Supreme Court appoint an *ad hoc* judge to oversee Defendant's habitual offender hearing.

Although Judge Harry F. Randow was originally appointed to these proceedings, in July of 2023 the court asked the Louisiana Supreme Court to appoint a new judge due to Judge Randow's time restrictions. Judge John E. Conery was then appointed for Defendant's habitual offender hearing.

On September 7, 2023, after hearing, Defendant was found to be a fourth or subsequent habitual offender, and the trial court imposed the sentence of life imprisonment at hard labor without benefit of probation, parole, or suspension of sentence as mandated by La.R.S. 15:529.1(A)(4)(c).

Defendant now appeals his carjacking conviction and habitual offender adjudication and sentencing.

## ASSIGNMENTS OF ERROR

Defendant raises five assignments of error:

(1) the original trial judge should have recused himself because "he was the attorney prosecutor in a previous criminal matter involving the defendant."

(2) the trial court erred by allowing the State to charge Defendant with a different crime than the one he confessed to committing.

(3) the trial court gave confusing and inconsistent jury instructions "causing the jury to find [D]efendant guilty of the offense of carjacking on insufficient evidence."

(4) the trial court erred in failing to advise Defendant of his rights prior to the habitual offender hearing.

(5) the trial court erred in allowing the habitual offender hearing to occur.

## ERRORS PATENT:

In accordance with La.Code Crim. P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find that there are no errors patent.

## ASSIGNMENT OF ERROR NUMBER THREE

In his third assignment of error, Defendant contends, "The trial court erred when it gave confusing and inconsistent jury instructions causing the jury to find Defendant guilty [of] the offense of carjacking on insufficient evidence to support the charge and the conviction." Although Defendant raises the issue of sufficiency of the evidence in his third assignment of error, we will address this issue first, as the supreme court has previously held that when issues of sufficiency of evidence are raised, alongside additional errors, the sufficiency issue should be addressed first. *State v. Hearold*, 603 So.3d 731 (La.1992).

### *STANDARD OF REVIEW:*

The analysis for insufficient-evidence claims is well settled:

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979), *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See State ex rel. Graffagnino*, 436 So.2d 559 (*citing State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371.

It is the factfinder's role to weigh the respective credibility of the witnesses, and the reviewing court will not second-guess the credibility determinations of the factfinder beyond the sufficiency evaluations under the *Jackson* standard of review. *State v. Richardson*, 425 So.2d 1228 (La.1983).

In reviewing Defendant's claim, we must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found Defendant guilty beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781(1979); *State v. Rosiere*, 488 So.2d 965 (La.1986).

In the instant case, Defendant was convicted of carjacking, in violation of La.R.S. 14:64.2. Carjacking is defined as "the intentional taking of a motor vehicle, as defined in R.S. 32:1(40), belonging to another person, in the presence of that person, or in the presence of a passenger, or any other person in lawful possession of the motor vehicle, by the use of force or intimidation." As previously noted by the second circuit:

> Thus, the elements of carjacking are: (1) the intentional taking (2) of a motor vehicle, as defined in La.R.S. 32:1(40)(3), belonging to another person (4) in the presence of that person, or in the presence of a passenger, or any other person in lawful possession of the motor vehicle (5) by the use of force or intimidation.

*State v. Edwards*, 52,755, pp. 14–15 (La.App. 2 Cir. 6/26/19), 277 So.3d 1223, 1233, *writ denied*, 19-1409 (La. 7/17/20), 298 So.3d 171.

4

*SUFFICIENCY OF EVIDENCE:*

As Defendant raises the sufficiency of evidence as an assignment of error, we will review and provide a summary of the evidence adduced at trial.

*Trial Evidence*

The State's first witness was Deputy Jeff Strahan of the Allen Parish Sheriff's Office (APSO). Deputy Strahan testified that on November 9, 2021, he was dispatched to Highway 10 near the water treatment plant in Oakdale, Louisiana, in response to a one-vehicle crash possibly involving a stolen vehicle. Upon arrival, Deputy Strahan saw a dark-colored vehicle flipped over in the ditch on the south side of Highway 10 and a white male walking down the road. Noting the man, identified as Mitchell Marcantel (the victim), had a laceration and swelling on his face, Deputy Strahan initially thought Mr. Marcantel had been driving the overturned vehicle. Mr. Marcantel advised Deputy Strahan he had been driving east when he saw the overturned vehicle, which had two occupants, a male and a female. Mr. Marcantel described the two people to Deputy Strahan as a black female over six-feet-tall and a medium-build black male with a little facial hair. Mr. Marcantel advised Deputy Strahan that after helping them out of the vehicle, the male attacked him, then the two jumped in his car and drove west, back towards Oakdale. According to Deputy Strahan, Mr. Marcantel's explanation of the attack gave him the impression Mr. Marcantel was taken "by surprise." He also relayed that Mr. Marcantel told him he was attacked between his car and the overturned car in the ditch, a Mazda 6.

After obtaining the VIN number for the vehicle from Marcantel's insurance card, Deputy Strahan had dispatch enter the car into a national database and issue a BOLO, or be on the lookout, for Mr. Marcantel's vehicle, a blue Hyundai. Deputy

Strahan testified that Detective Brandon Johnson arrived afterwards and helped process the scene, including taking photographs of both the scene and Mr. Marcantel's injuries. Those photographs, along with photographs of Mr. Marcantel's car after it was found, were entered into evidence.

According to Deputy Strahan, Mr. Marcantel's car was eventually located in Oakdale, Louisiana, about three miles away from where it was stolen. Deputy Strahan testified the Mazda 6 was registered to Ms. Tynisha Murray. Subsequently, the Criminal Investigation Division (CID) of the Allen Parish Sheriff's Office took over the case.

Mr. Marcantel, the victim and resident of Cottonport, Louisiana, testified that he has been a crane operator for Union Pacific since 2003 and that he travels all over Texas and Louisiana for his work. According to Mr. Marcantel, prior to the incident in question, he had stopped and assisted people who were in car accidents multiple times. Mr. Marcantel noted that on November 9, 2021, he was working in the Vinton/Starks area of Louisiana, building a bridge across the Sabine River, working eight days on, six days off.

On the date of this incident, Mr. Marcantel testified he was headed home from Starks and at about 10:00 p.m. as he was driving through Oakdale, he noticed a vehicle upside down in the ditch with its headlights on. Mr. Marcantel stated he stopped his vehicle about 50 feet from the overturned car, left it running with the door closed, grabbed his flashlight and went to check on the other vehicle. As he approached the overturned vehicle, Mr. Marcantel heard people inside "screaming for help," so he descended the ditch and opened the rear passenger door, assisting Defendant and a taller lady out of the car.

6

After helping the two people out of the car, Mr. Marcantel testified they tried to convince him to bring them to Oakdale, however, he insisted they call law enforcement and paramedics to check on their condition. Mr. Marcantel testified he began feeling more nervous as the two continued insisting that he take them away from the scene of the accident, so Mr. Marcantel began walking to his car with the two following just a few feet behind him. According to Mr. Marcantel, a red truck had also stopped at the scene, but after the female spoke to the driver of the truck, the truck left. Afraid that he would not be allowed to get into his car and close the door, Mr. Marcantel began walking away from his car in an attempt to draw Defendant and the female away from it. However, the female stayed by his car and Defendant continued following him, acting "[k]ind of nervous and like real edgy." Then, according to Mr. Marcantel, when he was approximately ten feet away from his car, he turned, and Defendant punched him and tackled him. After Defendant got on top of Mr. Marcantel and began hitting him, Mr. Marcantel responded by hitting Defendant with his flashlight to get Defendant away from him.

According to Mr. Marcantel, Defendant then jumped off of him, ran back to Mr. Marcantel's car, and drove away with the female in the passenger seat. Mr. Marcantel testified that Defendant had difficulty getting the car into gear as it was a manual transmission and that he did not attempt to remove Defendant from his car out of fear Defendant would attack him again.

Mr. Marcantel testified he then saw headlights coming from Oakdale, which turned out to be an ambulance. The paramedics briefly checked Mr. Marcantel's injuries, contacted law enforcement and then left to transport someone else. Eventually, law enforcement arrived and spoke with Mr. Marcantel, although he could not remember the names of the officers. According to Mr. Marcantel's

testimony, his wallet and a cooler were gone from the car when it was recovered; however, the computers and air conditioner he had in the trunk were still there. After spending about twenty minutes at the Oakdale Police Department, Mr. Marcantel's father and son arrived to pick him up and bring him home.

On cross-examination, Mr. Marcantel testified that he had spent a few minutes gambling at a small casino before heading home, and he also testified that he does not drink. He stated that after he walked to his car then started walking back towards the wreck, Ms. Sanford stayed by the passenger side of his car. He also stated that although neither Ms. Sanford nor Defendant asked to use his phone, they were both insistent that he take them back to Oakdale rather than report the accident. According to Mr. Marcantel, Ms. Sanford did not get into his car until after the Defendant attacked him and ran back to Mr. Marcantel's car.

Mr. Marcantel identified his flashlight in one of the photographs introduced into evidence, noting it is about a foot long and made of metal with a rubber outer coating. Mr. Marcantel testified he was swinging the flashlight as hard as he could to get Defendant off of him after Defendant attacked him. Mr. Marcantel testified he was nervous because Defendant was walking right behind him, and that Defendant hit him as soon as he turned around. According to Mr. Marcantel, Defendant did not ask him a question that led him to turn around. He had nothing in his waistband, and the flashlight was already in his hand while he was assisting and walking.

Mr. Marcantel further testified that he believes he could have gotten back to his car, which was about ten feet away, before Defendant could have taken it if Defendant, instead of attacking him, had simply run to his car and tried to drive

away. However, after Defendant attacked him, he called and went for help rather than trying to get Defendant out of the car.

The State's next witness was Detective Dustin Doyle of the APSO, who was assigned to take over the case in the waning hours of November 9, 2021, going into the early hours of November 10, 2021. Detective Doyle testified Mr. Marcantel's car was found in the driveway of an abandoned house a few miles from where Defendant flipped the Mazda 6. He further testified that narcotics officers stopped another vehicle on Paul Brown Road near where Mr. Marcantel's car was found, and among the individuals in that vehicle was Ms. Murray, the registered owner of the Mazda 6. Ms. Murray then informed law enforcement that she had allowed her brother, Defendant, to use the vehicle a few hours earlier, and also identified Ms. Sanford as being in a relationship with Defendant. This information, coupled with the description of the suspects from Mr. Marcantel, led Detective Doyle to the conclusion that Defendant was a suspect in the carjacking. Detective Doyle testified he then obtained arrest warrants for Defendant and Ms. Sanford, noting one of the crimes charged in the arrest warrants was carjacking. Detective Doyle testified that, at that time, they were unable to determine the whereabouts of Defendant or Ms. Sanford because "[n]obody would corroborate any information."

Detective Doyle further testified that on December 2, 2021, the APSO received a call reporting a stabbing on Harvey Street in Oakdale, and units were dispatched. However, the dispatcher noted the GPS coordinates from the cellphone were at a hotel on the opposite side of town, so units were sent out to both locations. After being informed by the hotel manager that only two people were staying at the hotel, law enforcement approached the hotel room and arrested both Defendant and Ms. Sanford. Defendant and Ms. Sanford were brought to the APSO Criminal

9

Investigations Division headquarters in Oberlin, Louisiana, where they were interviewed regarding the November 9, 2021 incident. Detective Doyle identified a USB drive containing an audio/video recording of Defendant's statement to Detective Doyle, which was then published to the jury.

*Defendant's Statement*

The record shows that Detective Doyle entered the interview room just before the two-and-a-half-minute mark, and Defendant immediately began telling him that Ms. Sanford "really did not want to leave the scene" and that she had "nothing to do with it." Detective Doyle went over a *Miranda* rights form with Defendant, who waived his rights and voluntarily gave his statement. Defendant told Detective Doyle that he and Ms. Sanford were heading into Oakdale to retrieve a Social Security card left at a hospital earlier that day. He claimed he encountered a car coming towards them in his lane of traffic, so he swerved to avoid them, but the other car also swerved. In the process of trying to swerve back into his lane of traffic, Defendant claimed the car lost traction and flipped, knocking him unconscious.

Upon waking, Defendant claimed he could not move, and Ms. Sanford could not get the door open, and then someone approached the car, opened the door and helped them out of the vehicle. According to Defendant, he asked the individual to call his mother and sister to let them know the car was flipped. Defendant claimed the individual refused, saying he was going to call the sheriff's office instead. Defendant, however, still wanted to contact his family because the car belonged to his sister, and Defendant claimed the man's refusal to call anyone other than law enforcement was "spooking" him. According to Defendant, the man pulled a black flashlight out of his waistband, at which point Defendant punched him. Defendant claimed they fell to the ground and the man was hitting him with the flashlight, so

10

he jumped into the man's car and drove down the road to get away. He stated that Ms. Sanford kept trying to calm him down and told him to stay, but he was worried the man was armed.

When asked how many times he thought the man hit him with the flashlight, Defendant gave a non-responsive answer that he went to a doctor and was told he may have had a minor stroke on his right side, that he claimed was from the man hitting him. According to Defendant, he only hit the man once, at which point the man tackled him to the ground and held onto his shirt while repeatedly hitting him in the head with the flashlight. Defendant then claimed someone else in a red pick-up truck had arrived with the man he punched, but that that person just disappeared. Defendant claimed he left the car in perfect condition, stating he was just "shook up" and trying to get away from danger.

Defendant then testified that he heard someone else was caught riding in the car after he abandoned it. He identified one of the individuals he believed was in the car as his sister's boyfriend, Braylon. Defendant claimed that after he abandoned the car, he called his sister and told her what happened, and he was unaware when he borrowed the car that she did not have insurance on it. According to Defendant, he abandoned the vehicle on Dixie Street, not Paul Brown Road. Defendant again asserted that Ms. Sanford had nothing to do with taking the car, and that Ms. Sanford was telling him to stay by his sister's car, but he would not listen, because he was "on that meth."

When Detective Doyle mentioned that items were missing from Mr. Marcantel's vehicle, Defendant again proclaimed that it had to be Braylon or someone else that took the items because he did not take anything out of the car when he abandoned it on Dixie Street. According to Defendant, he and Ms. Sanford

abandoned the car and immediately returned to her trailer. Defendant subsequently acknowledged calling in a false report of "a bad stabbing in the projects."

Acknowledging that the audio in the video was sometimes difficult to understand, Detective Doyle clarified that during the interview, Defendant claimed he hit Mr. Marcantel, who then grabbed him and pulled him to the ground. Although Defendant ended up on top on Mr. Marcantel, he claimed Mr. Marcantel grabbed his shirt with one hand and repeatedly struck him in the head with the flashlight. Detective Doyle clarified Defendant claimed they left the car on Dixie Street in "the field in front of Terry Davis' mother's house" and that Defendant admitted to being "geeked out on meth." In Detective Doyle's experience, individuals who are "geeked out on meth" suffer from paranoia and delusions.

On cross-examination, Detective Doyle testified that Defendant claimed he hit Mr. Marcantel because "he reached back into his pocket and [Defendant] thought he was gonna pull a gun so [Defendant] hit him." Detective Doyle acknowledged that Defendant indicated he was scared for his life, that he subsequently got a CAT scan due to headaches following the incident, and that Ms. Sanford's statement was "fairly consistent" with Defendant's statement. He indicated Ms. Sanford reported hearing Defendant ask Mr. Marcantel "what was he reaching for" before they began fighting.

The State's next witness, Mr. William Johnson, investigator for the Allen Parish District Attorney's Office, testified that part of his job was to review jail calls and visits of defendants heading to trial. In the instant case, Mr. Johnson noted Defendant had "quite a few" calls to review. Mr. Johnson identified a USB drive containing some of Defendant's jail calls. Following discussions regarding the admissibility of some of the calls on the drive, the State ultimately published

12

redacted portions of two calls, identified as Phone Call M made on January 14, 2022, and Phone Call N on December 21, 2021. The State played roughly thirty seconds of Phone Call M and approximately six-and-a-half minutes of Phone Call N. Defense counsel requested and was allowed to proffer the complete versions of these calls.

*Phone Call M*

The first call was only thirty-three seconds long. In it, Defendant told someone:

> All that woman did was rode with me to Ville Platte, man. On our way back, I flipped the car. We asked the man for some help. The man acted like he wanted to do something, so I fucked him up. She didn't do nothing! I did everything, man. She didn't do shit. I busted his ass up. I did what I was supposed to do. Straight up. That's how that went. I took his car. That's what happened.

*Phone Call N*

The portion of Phone Call N published to the jury was seven minutes long. It began with Defendant telling someone that he was lucky to survive flipping the car. He then claimed Mr. Marcantel told the news he was trying to crack Defendant's cranium with his flashlight. Defendant then stated he "beat the fuck out of that boy. I had him looking like Elephant Man." Defendant then laughed at the victim's statement to the news. Defendant described the wreck that flipped the car the same way he described it to Detective Doyle, except that this time he acknowledged that he was going way too fast into the curve.

Defendant claimed he thought Mr. Marcantel had robbed him, then said he asked Mr. Marcantel to call his mother, but Mr. Marcantel said he was calling APSO. He then claimed Mr. Marcantel would not help him, and that he messed up Mr. Marcantel's eye. He described Mr. Marcantel's testimony at a hearing as "he played

13

all kinds of fuckboy games." Defendant then claimed that he was "on about three daiquiris," although he also mentioned possibly being amped up on pills. He stated he was taking pain pills and that he was "drunk out of [his] mind."

Ms. Victoria Thompson, a 9-1-1 dispatcher with APSO, identified a USB drive containing a 9-1-1 call Mr. Marcantel made on November 9, 2021, which was then published to the jury. In the call, Mr. Marcantel informed 9-1-1 that he stopped to help a wrecked vehicle and the individuals from the wreck stole his car. Mr. Marcantel informed the operator that an ambulance was at his location, and he can be heard telling the paramedic that he was trying to fight back with his flashlight, but the man kept hitting him.

The State's next witness was Charlene Vickers Hudgens, a dispatcher for the APSO with thirty years of experience. Ms. Hudgens testified that on December 2, 2021, she received a call from a female reporting a stabbing on Harvey Street in Oakdale, Louisiana. However, Ms. Hudgens noted the GPS location of the call was nowhere near Harvey Street, so she directed officers to both Harvey Street and the motel from which GPS indicated the call originated.

Ms. Sanford, Defendant's ex-girlfriend, testified that on November 9, 2021, Defendant brought her granddaughter to the doctor in Ville Platte, but left her Social Security card at the office, and they were returning to Ville Platte to retrieve it. According to Ms. Sanford, Defendant brought the granddaughter to Ville Platte in his silver Impala; however, they used Defendant's sister's car on the return trip because Defendant's headlight was out. She stated they met a woman she did not know at Burger King to get the card, although she never saw the card, then left Ville Platte to return to her home in Oakdale.

Ms. Sanford testified that on the way back from Ville Platte, Defendant was acting very aggressively, cussing her out while speeding; she also testified that she suspected he was under the influence. Ms. Sanford then gave the following description of the car crash:

> Then he - - that is when he was going fast, and he lost control, tried to avoid another car on the other side, and lost control. The car slid and we hit a pole. And from there we flipped. And I remember coming down on the opposite side of the road.

Ms. Sanford indicated that she believed she was temporarily unconscious, and when she awoke the inside of the car was full of smoke coming from the dashboard. Ms. Sanford testified that Defendant asked her if she was alright, then asked her to open the door so they could get out; however, she could not open the front door. After about twenty seconds, someone approached with a flashlight and asked if they were okay or needed help. When Ms. Sanford indicated they needed assistance, the man pulled open the back door and helped her and Defendant get out of the car. Ms. Sanford described the man as a husky white guy "about five eight or five nine." The man stated he was going to call the police to get assistance for Ms. Sanford and Defendant. She testified she asked him to also call their families to let them know they were in an accident and were okay. She testified Defendant wanted the man to call Defendant's sister and Defendant was telling him not to call the police.

Ms. Sanford further testified the three of them were walking back and forth between the overturned car and Mr. Marcantel's car, which was not far away, for a few minutes. During that time, she flagged down another vehicle and asked if they could give her and Defendant a ride. The driver said he would be right back, then left and did not return. According to Ms. Sanford, Defendant and Mr. Marcantel were arguing over Mr. Marcantel's phone prior to the fight, and she did not see who

15

started the fight. Ms. Sanford testified that Defendant and Mr. Marcantel were standing directly beside Mr. Marcantel's vehicle when the altercation occurred. Ms. Sanford testified she saw Defendant hit Mr. Marcantel, but she did not see Mr. Marcantel hit Defendant nor did she see the flashlight. She testified that while she was near the front driver's side of Mr. Marcantel's car, Defendant got up, jumped into the driver's seat and told her to get into the car. She testified Defendant told her he had "to get [her] home to [her] kids." Then they left the scene, turned around, and headed back towards Oakdale.

According to Ms. Sanford, Defendant dropped her off at her house on Main Street and left, and when he returned, he told her he left the car on Dixie Street. She testified Defendant called his sister, who came and spoke with him at Ms. Sanford's house, and at that point Defendant insisted he and Ms. Sanford needed to leave. Ms. Sanford testified they went to Orange, Texas, where they stayed for a while in a hotel.

Tiring of being with Defendant, Ms. Sanford eventually returned to Oakdale, where she spoke with her pastor and planned to turn herself in to law enforcement. Before she could turn herself in, law enforcement showed up at her house and Defendant's mother's house looking for them, so they got scared and then went to hide out at a motel in Oakdale. She stated that Defendant thought law enforcement saw him, so he had her call in a fake emergency on Harvey Street. Ms. Sanford acknowledged having a criminal history, stating she had convictions for, among other things, drug charges, theft, robbery, but that she resolved to turn her life around when her mother died in March of 2019. She also acknowledged that she was originally charged with carjacking in this case, just like Defendant.

16

On cross-examination, Ms. Sanford stated Defendant and the victim were a few feet in front of the car when the altercation took place. She eventually stated that she could have gotten in the car and driven away without hurting anyone if she had wanted to do so. She did not recall previously stating under oath that Mr. Marcantel was reaching for anything when the altercation with Defendant began and claimed that she told Detective Doyle that Mr. Marcantel was reaching for his flashlight, because that was what Defendant had told her he was doing.

Following Ms. Sanford's testimony, the State rested its case.

*ANALYSIS:*

As previously noted, the elements of carjacking are: (1) the intentional taking (2) of a motor vehicle, as defined in La. R.S. 32:1(40) (3) belonging to another person (4) in the presence of that person, or in the presence of a passenger, or any other person in lawful possession of the motor vehicle (5) by the use of force or intimidation. *Edwards*, 277 So.3d at 1233.

However, Defendant has not contested each of the elements of the offense, as he has repeatedly admitted to intentionally taking Mr. Marcantel's car. At trial, and in his brief to the court, Defendant's main contention is whether Mr. Marcantel's car was "in his presence" at the time Defendant took the car. Citing *Edward*, trial counsel requested a specific jury instruction stating, "the motor vehicle taken in the carjacking must be sufficiently under the victim's control, that absent violence, or intimidation the victim could have prevented the taking." The trial court ultimately denied the jury instruction. However, we note that the actual language of *Edwards*, contained the following additional and pertinent language:

> There is no Louisiana jurisprudence explaining what "in the presence of the person" means under La.R.S. 14:64.2. The trial court cited *State v. Thomas*, 447 So. 2d 1053 (La. 1984), in determining the

17

phrase's meaning. The court in *State v. Thomas, supra* at 1055, stated, "The property taken in a robbery must be sufficiently under the victim's control that, absent violence or intimidation, the victim could have prevented the taking. If a defendant has taken advantage of a situation which resulted from the prior use of force or intimidation, most jurisdictions hold that a robbery has occurred." The carjacking statute, La.R.S. 14:64.2, is included in the criminal code with other robbery statutes and is itself a type of robbery. Therefore, the reasoning set forth by the court in *State v. Thomas, supra*, is applicable.

*State v. Edwards*, 277 So.3d at 1233.

Although defense counsel at trial, and again in brief, argues that Mr. Marcantel was too far away from his vehicle when Defendant attacked him for the car to be considered in his presence, we find there is no factual question that Defendant was indeed able to take the car as a direct result of his unprovoked attack on Mr. Marcantel immediately prior to the taking. Specifically, Defendant, in both his interview and subsequent jail calls, made it clear that he struck Mr. Marcantel first. Likewise, Mr. Marcantel testified that immediately after assisting Defendant and Ms. Sanford, when he turned back towards his car Defendant hit him first "out of nowhere." Additionally, Mr. Marcantel testified that he believes he could have gotten back to his car before Defendant could have taken it if Defendant, instead of attacking him, had simply run to his car and tried to drive away. However, after Defendant attacked him, he called and went for help rather than trying to get Defendant out of the car.

Pursuant to *Edwards*, we find the facts of this case fall squarely into the category of Defendant taking "advantage of a situation which resulted from the prior use of force or intimidation." There was ample evidence of Defendant's unprovoked attack on Mr. Marcantel, thus there was a "violence." Accordingly, we find the State's evidence, when viewed in the light most favorable to the prosecution, clearly

18

established beyond a reasonable doubt all of the elements of the crime of carjacking by Defendant.

*Other claims:*

Additionally, Defendant, in brief, makes other arguments/claims that are not supported by the evidence adduced at trial, and contradicted by the record before this court. First, Defendant argues that Mr. Marcantel used a weapon in fighting off Defendant *after* Defendant attacked him, and thus "obviates the element of 'by force or intimidation.'" We find no support for this assertion in the evidence adduced or in the law. To the contrary, someone who starts a conflict cannot claim self-defense without clearly disengaging from the conflict. *See* La.R.S. 14:21. Here, the evidence shows Mr. Marcantel defended himself with a flashlight only *after* Defendant attacked him, and shortly after Mr. Marcantel had assisted Defendant and Ms. Sanford out of an overturned car that they were unable to escape on their own.

Next, Defendant argues that the jury instructions were "confusing and conflicting." Specifically, Defendant refers to "Page 13 of trial transcript." However, the referenced language refers not to the actual jury instructions but to the initial instructions given by the court at the outset of trial. After a review of the record, we find this claim to be inaccurate, as the record shows that the jury was twice properly instructed on the elements of the crime of carjacking. Here, the actual instructions properly given to the jury regarding carjacking were as follows:

> Carjacking is the intentional taking of a motor vehicle belonging to another person, in the presence of that person, or in the presence of a passenger, or any other person in lawful possession of the motor vehicle, when the taking is accomplished by the use of force or intimidation. "In the presence of" means within his reach, inspection, observation, or control. Motor vehicle means every vehicle which is self-propelled. Thus, in order to convict the defendant of carjacking, you must find that the State has proved, beyond a reasonable doubt, that: the defendant intentionally took a motor vehicle belonging to

another person; and that the motor vehicle was in the presence of a person when it was taken; and that the person was the owner, passenger or person in lawful possession of the motor vehicle; and that the defendant used force or intimidation against that person in order to accomplish the taking.

Finally, Defendant contends and argues as follows (emphasis added):

"Again, the *7-panel jury* voted overall "guilty" on the charge of "carjacking" however, there was only 1 individual juror who voted guilty for carjacking as the 6 other jurors on the panel voted for a lesser charge. This alone negates a final verdict of carjacking, and it indicates that all elements were not met for the charge. The guilty verdict on the charge of carjacking is a direct result of the confusing and inconsistent jury instructions."

In Louisiana, a criminal jury consists of either six or twelve-person jury panels, depending on the offense charged. La.Code Crim.P. art. 782(A). Additionally, in some cases for a jury verdict to be valid, it must be unanimous. Here, ignoring the fact that under our current law, no criminal jury in Louisiana will consist of *seven* jurors, the record clearly shows this jury unanimously found Defendant guilty of carjacking, and after the verdict was announced, the foreperson of the jury confirmed it was a unanimous decision. The trial court then polled the jury, at defense counsel's request, again confirming that all twelve jurors voted to find Defendant guilty of carjacking.

In summary, a review of the record shows all of these arguments, made as part of assignment of error number three, is not supported by the record and this assignment of error lacks merit.

**ASSIGNMENT OF ERROR NUMBER ONE:**

In Defendant's first assignment of error, he contends "The trial court erred when the presiding judge failed to recuse himself after being advised that he was the attorney prosecutor in a previous criminal matter involving the defendant." This assignment of error is a misstatement of fact and lacks merit. Defendant cites

20

La.Code Crim.P. art. 671(2) and (5) as reasons why the trial judge should have recused himself. We note that neither of those grounds for recusal would apply to the trial judge based on Defendant's factual claims, as the judge was not related to any of the parties or members of the district attorney's office, nor did he perform a juridical act in the current cause in another court. Defendant, in brief, admits that this "issue was raised but, failed to be put on the record during a sidebar conference." Here, there is no record reference or indication of when this conversation took place.

Furthermore, the presiding judge for Defendant's trial, the Honorable E. David Deshotels, never prosecuted Defendant for another crime. Additionally, prior to his election to the bench, Judge Deshotels was a public defender who previously represented Defendant, namely his February 8, 2007 guilty plea to simple burglary of an inhabited dwelling in trial court docket number 2006-1455, as well as a plea of guilty of possession of a counterfeit controlled dangerous substance in trial court docket number 2006-1060. In short, the basis for this assignment of error is factually inaccurate, and Defendant fails to put forth any competent evidence or legal support for his claim that Judge Deshotels should have been recused from presiding over the present case. Thus, this assignment of error is without merit.

### ASSIGNMENT OF ERROR NUMBER TWO:

In Defendant's second assignment of error, he argues that "[t]he trial court erred when it disregarded admissions made by defendant to a different and lesser felony charge, but somehow the state was able to proceed with trying defendant on an unsubstantiated more serious aggravated felony charge with glaring intent to sentence defendant under the Louisiana Habitual Offender Statute." Defendant contends that because he allegedly confessed to a lesser felony, presumably

21

unauthorized use of a motor vehicle, the trial court erred in allowing him to be charged with carjacking. The State contends this claim is "legally unfounded[.]"

We find this claim by Defendant to be contrary to Louisiana law. Louisiana Code of Criminal Procedure art. 61 explains the powers and duties of a district attorney, as "[s]ubject to the supervision of the attorney general, as provided in Article 62, the district attorney has entire charge and control of every criminal prosecution instituted or pending in his district, and determines whom, when, and how he shall prosecute." Therefore, Defendant's claim that the trial court should or could have dictated what Defendant was charged with is inaccurate and legally incorrect when Louisiana law expressly states that the district attorney has that power, not the district court.

Furthermore, and to the extent that Defendant contends he should only be able to be charged with the crime he allegedly confessed to committing, we find that Defendant's statement to law enforcement was sufficient to justify a carjacking charge. Defendant explicitly told law enforcement that he was feeling paranoid and used force against the victim near the vehicle, and when the victim began to get the better of the exchange, Defendant took the victim's car and drove away, making sure Ms. Sanford also got in with him. In short, Defendant's confession established that he committed all of the elements of the crime of carjacking. Therefore, there is no factual or legal support for the claim that the trial court should or could have made the district attorney charge Defendant with a different crime. This assignment of error is without merit.

**ASSIGNMENT OF ERROR NUMBER FOUR:**

In his fourth assignment of error, Defendant claims, "The trial court erred when it failed to advise the defendant of his right to remain silent, his right to a formal hearing and his right to have the State prove its case against him at the habitual offender hearing." Defendant argues the trial court's failure to advise him of these rights renders his habitual offender hearing invalid. We disagree.

In *State v. Alexander*, 05-276, p. 4 (La.App. 3 Cir. 11/2/05), 916 So.2d 303, 305, this court stated, "We find the trial court's failure to advise the Defendant of his rights was harmless because a full hearing was held at which the Defendant was adjudicated a second habitual offender and the Defendant never acknowledged his habitual offender status nor testified at the hearing." Likewise, in the instant case, Defendant acknowledges that a hearing took place at which he was adjudicated a fourth or subsequent habitual offender and that he neither took the stand nor acknowledged his status as a habitual offender.

Based on our review of the record, we find this claim to be an inaccurate characterization of the habitual offender adjudication hearing. Defendant's trial counsel, who is also the appeal counsel, argued to the trial court that Defendant had a tenth-grade education, and that "it is unclear if Mr. Goudeau had the capacity to make the statements that he made, and that he also may have actually just been under the influence." His counsel also objected to the admission of a different prior guilty plea because "it is hard to determine whether Mr. Goudeau had the capacity to understand the nature and consequences of what he was pleading to." However, at no time did Defendant state to the trial court that he did not understand what had occurred or that he did not know what was happening, even though his counsel made such claims. Based on *Alexander*, we find that any error in the trial court not

23

advising Defendant of his rights at his habitual offender adjudication was harmless error as he was adjudicated a habitual offender following a full hearing wherein he was not forced to testify or acknowledge his status. Thus, this assignment of error is without merit.

## ASSIGNMENT OF ERROR NUMBER FIVE:

In his final assignment of error, Defendant contends, "The trial court erred when it sentenced the defendant under the Habitual Offender Statute contrary to exception provisions." Defendant appears to argue that because the offenses used to adjudicate him a habitual offender date as far back as 2010, these offenses should not have been considered for the purposes of a habitual offender adjudication.

Pursuant to La.R.S. 15:529.1(C)(1), offenses are not considered as prior offenses for habitual offender adjudication if more than five years have elapsed between the commission of the current offense and the end of supervision for the prior offense. Likewise, pursuant to La.R.S. 15:529.1(C)(2), the time period is ten years if the prior offense is a crime of violence as defined by La.R.S. 14:2(B). However, for both of those circumstances, the following *caveat* is included in the statute:

> In computing the intervals of time as provided in this Paragraph, any period of parole, probation, or incarceration by a person in a penal institution, within or without the state, shall not be included in the computation of any of the . . . periods between the expiration of the correctional supervision, or term of imprisonment if the offender is not placed on supervision following imprisonment, and the next succeeding offense or offenses.

Here, Defendant was adjudicated a fourth or subsequent habitual offender based upon evidence adduced at the hearing and specifically pursuant to Defendant's previous felony trial court docket numbers 2019-2056, 2019-346, 2013-4009, and 2010-2110. In court docket number 2019-2056, Defendant was convicted of two

24

counts of possession with the intent to distribute CDS II in amounts less than 28 grams. In court docket number 2019-346, Defendant was convicted of second-degree battery. In court docket number 2013-4009, Defendant was convicted of possession with the intent to distribute CDS II and resisting a police officer with force or violence. Finally, in court docket number 2010-2110, Defendant was again convicted of second-degree battery. Pursuant to La.R.S. 14:2(B), second degree battery is a crime of violence, as is the instant offense of carjacking. Accordingly, a ten-year cleansing period applies to both felony court docket numbers 2010-2110 and 2019-346.

At Defendant's habitual offender adjudication hearing, his parole officer, Mr. Damien Guillory, testified Defendant finished parole for trial court docket number 2010-2110 on October 3, 2021, roughly a month before the instant offense of carjacking. Additionally, Mr. Guillory testified that Defendant was still on parole supervision for the other three felony court docket numbers, 2019-2056, 2019-346, 2013-4009, at the time he committed the instant offense. Furthermore, the time an offender is on parole is not considered part of the cleansing period.

In short, a review of the record shows that the cleansing period had not elapsed since Defendant was either actively incarcerated or on parole from his convictions of these previous felony offenses/convictions as of the date of the instant offense of carjacking. Accordingly, this assignment of error lacks merit.

### DECREE

Defendant's conviction, habitual offender adjudication and sentence are affirmed.

**CONVICTION AFFIRMED; HABITUAL OFFENDER
ADJUDICATION AND SENTENCE AFFIRMED.**

25